IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

COURTNEAY A.                          )
DELLAVALLE-JONES,                     )
                                      )
              Plaintiff,              )
                                      )
       *vs.*                          )    Cause No. 1:20-CV-288-SEB-MJD
                                      )
XEROX CORPORATION and LYNNE           )
MALONE, Individually and in her Official )
Capacity,                             )
                                      )
              Defendants.             )

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

Despite Plaintiff Courtney A. DellaValle-Jones' high-risk pregnancy, disability and request

for FMLA-qualifying leave, Xerox Corporation ("Xerox") – with knowledge of the severe medical

issues for Courtney and her unborn child – wrongly terminated Courtney from her employment.

Xerox intentionally terminated Courtney after learning of her high-risk pregnancy, and after she

applied for short term disability and FMLA-qualifying leave. After significant complications arose

with Courtney's baby, and one day after Courtney filed for short-term disability leave, Ms. Lynne

Malone called Courtney by telephone and terminated her employment with Xerox. Ms. Malone

learned of Courtney's pregnancy and the complications with her baby five weeks prior to

terminating her employment on May 1, 2018. Xerox also denied Courtney the opportunity to

transfer to another open position for which Courtney was qualified.

Throughout Courtney's nearly four years of employment with Xerox, Xerox documented

Courtney's performance as satisfactory and above satisfactory. Courtney, with the knowledge and

consent of Xerox, took on additional job duties outside the scope of her position, often leading to

her working more than the customary forty (40) hour work week. Notwithstanding this undisputed

job performance by Courtneay, Ms. Malone chose Courtneay for an involuntary reduction-in-force ("RIF"). Ms. Malone did not terminate Courtneay's employment based on performance. Rather, Ms. Malone allegedly chose Courtneay because the billing functions of her job were being transferred to Guatemala.

But, Ms. Malone does not explain why Courtneay could not backfill a job being vacated by one of Courtneay's team members, Gabrielle Joubert, even though Courtneay was qualified for the job. Ms. Malone sought and obtained permission to transfer other persons under her supervision to other positions that were remaining or being backfilled, but Xerox and Ms. Malone denied Courtneay the opportunity to transfer to the open position of her fellow team member.

Ms. Malone told Courtneay that all Account Operations Manager positions were being eliminated on May 1, 2018. She failed to explain, however, that many persons in those positions would remain employed under a different job title of Service Delivery Manager. Further, she denied Courtneay the opportunity to transfer to Ms. Joubert's job, even though Courtneay asked Ms. Malone on the day she was fired and Ms. Muncy a week later if she could transfer to another position. Given Courtneay's good performance and ability to perform the job, Xerox's intentional refusal to allow Courtneay to transfer to the open position is evidence that Xerox terminated Courtneay's employment because she had a pregnancy-related disability and needed to take medical leave. This is further evidenced by Ms. Malone's April 25, 2018 e-mail with another Xerox colleague, Ms. Tammy Leger, in which Ms. Malone stated: "Courtneay is pregnant, there are issues with baby and Sally [Muncy] told me tonight she may be going on leave of absence. ugh…" In that same exchange, Ms. Malone also discussed replacing Ms. Joubert's job with someone else.

Given the pile of evidence in Courtneay's favor and the many issues of fact that remain, *Defendants' Motion for Summary Judgment* should be denied in its entirety.

## II.    FACTUAL BACKGROUND AND STATEMENT OF MATERIAL FACTS IN DISPUTE

**A.   In May 2014, Xerox Hired Courtneay.**

Xerox presented Courtneay with an offer letter of employment on May 6, 2014[1]. (DOE 100, Dkt. 57-25, at 26:7-10). Xerox offered Courtneay the position of Account Operations Manager ("AOM"). (DOE 100, Dkt. 57-25, at 26:14-17). Courtneay's first day at Xerox was June 2, 2014. (DOE 100, Dkt. 57-25, at 28:25-29:1). As assigned by Xerox, Courtneay's main job responsibilities consisted of managing and maintaining client relationships, services delivery operational leadership, people and resource management; dealing with customers; on-site training; achieving contract service level agreements; and maintaining customer satisfaction and financial/business growth. (DOE 100, Dkt. 57-25, at 39:17-40:4; DOE 26, Dkt. 57-16). Throughout her employment, Xerox assigned Courtneay additional responsibilities. (DOE 100, Dkt. 57-25, at 40:5-8). These included billing, project management and daily customer interaction. (DOE 100, Dkt. 57-25, at 40:9-15).

Ms. Sally Muncy supervised Courtneay throughout her entire tenure at Xerox. (DOE 100, Dkt. 57-25, at 63:4-6). Ms. Muncy's immediate supervisor was Ms. Lynne Malone (DOE 100, Dkt. 57-25, at 63:7-8). Ms. Muncy, not Ms. Malone, evaluated Courtneay's performance on an annual basis. (DOE 102, Dkt. 57-27, at 117:15-18). Courtneay never received below a "Meets Expectations" rating, and Ms. Muncy frequently rated Courtneay as "Exceeds all Expectations." (DOE 6, Dkt. 57-2; DOE 7, Dkt. 57-3; DOE 8, Dkt. 57-4; DOE 9, Dkt. 57-5; DOE 102, Dkt. 57-27, at 150:8-156:22).

**B.   Because of Her Excellent Performance, Xerox and Ms. Muncy Assigned Courtneay Medtronic and Procter & Gamble Billing Tasks in Addition to Her Regular Job Responsibilities.**

Between 2016 and 2017, Xerox, specifically Ms. Muncy, requested that Courtneay help with billing on the Procter & Gamble ("P&G") account. (DOE 100, Dkt. 57-25, at 46:6-21). This was

---

[1] *See* DOE 1, Dkt. 57-1, for a timeline of relevant and significant events.

because the current billing on the P&G account was "a mess." (DOE 100, Dkt. 57-25, at 46:15-16). Ms. Muncy again asked Courtneay to help with billing responsibilities in late 2017 or early 2018 on the Medtronic account. (DOE 100, Dkt. 57-25, at 46:23-47:1). Courtneay assisted with putting together the billing invoices and the backup reports for invoices, assuring that the backup reports matched the invoices, and submitting all billing invoices by their specific deadlines. (DOE 100, Dkt. 57-25, at 47:13-23). Courtneay spent approximately 40-50% of her time on these billing activities, as well as still performing her regular daily tasks. (DOE 100, Dkt. 57-25, at 47:23-25).[2]

These daily tasks included making sure her onsite docucare associates were performing at their sites; assuring her customers were pleased; coordinating break/fix tickets, service tickets, supplies; insuring that all devices were serviced and performing properly; and confirming that move/add/change/device ("MACDs") requests were completed. (DOE 100, Dkt. 57-25, at 48:1-13). Courtneay also completed Price Change Requests ("PCRs"); other reports, handled daily phone calls, and project management; tracked new devices; and assisted with anything other colleagues needed help with. (DOE 100, Dkt. 57-25, at 48:14-49:3). Despite all these tasks Courtneay performed in addition to billing, Ms. Muncy and Ms. Malone believed Courtneay spent approximately 90% of her time on billing-related tasks.[3] (DOE 102, Dkt. 57-27, at 55:14-18; DOE 101, Dkt. 57-26, at 63:1-5).

Ms. Muncy testified that Courtneay spent "90 percent of her 40-hour workweek…on billing processes."[4] (DOE 102, Dkt. 57-27, at 55:14-18). Ms. Muncy did not know how many hours Courtneay *actually* worked during a workweek, just that she knew Courtneay was always online by 8:00 a.m. and stayed online through the workday. (DOE 102, Dkt. 57-27, at 55:19-56:1, 56:17-57:1). Courtneay's assistance with Medtronic billing duties in 2017 usually occurred outside of normal

---

[2] This is a material fact in dispute.
[3] This is a material fact in dispute.
[4] This is a material fact in dispute.

4

working hours and after she had completed her other daily tasks. (DOE 100, Dkt. 57-25, at 49:9-16). Courtneay estimated that approximately 10 percent of her time was spent on Medtronic billing duties. (DOE 100, Dkt. 57-25, at 49:17-21).

### C.  In December 2017, Courtneay Learned She Was Pregnant.

Courtneay learned she was pregnant in mid-December of 2017. (DOE 100, Dkt. 57-25, 84:9-14). Shortly after, on the same day Courtneay confirmed she was pregnant via ultrasound, Courtneay informed Ms. Muncy of her pregnancy. (DOE 100, Dkt. 57-25, at 84:15-22). Courtneay informed other co-workers of her pregnancy after her twelve-week appointment. (DOE 100, Dkt. 57-25, at 84:23-85:10). Courtneay did not inform Ms. Malone of her pregnancy because Courtneay did not feel she had "that type of relationship" with Ms. Malone. (DOE 100, Dkt. 57-25, at 88:6-14; DOE 102, Dkt. 57-27, at 90:18-19). Ms. Malone and Courtneay had very few interactions together, and very rarely spoke one on one. (DOE 100, Dkt. 57-25, at 63:15-64:8).

### D.  Xerox Initiates Project Compass.

In the late summer of 2017, Xerox initiated Project Compass. Project Compass was a restructuring effort by Xerox to change specific roles and eliminate others. (DOE 101, Dkt. 57-26, at 28:22-30:9). As it pertained to Courtneay, Project Compass eliminated her AOM position and repurposed it into a newly formed Service Delivery Manager ("SDM") position. (DOE 101, Dkt. 57-26, at 29:1-11).

> 1.  *The newly formed SDM role included similar responsibilities to the AOM position being eliminated by Project Compass.*

The newly formed SDM role involved billing activities.[5] (DOE 25, Dkt. 57-15; DOE 31, Dkt. 57-17). Ms. Muncy emailed Courtneay the job description for the newly formed SDM role on

---

[5] This is a material fact in dispute. Ms. Muncy emailed Courtneay a job description on May 2, 2018, the day after Xerox terminated Courtneay's employment. (DOE 25, Dkt. 57-15). During her deposition, Ms. Muncy described this job description as containing the duties and responsibilities for both the AOM role as well the SDM role. (DOE 102, Dkt. 57-27, at 184:11-185:1). Ms. Malone, however, believed that DOE 25 represented the newly formed SDM position. (DOE 101, Dkt. 57-26, at 149:14-150:7).

May 2, 2018. (DOE 103, Dkt. 57-28, at ¶ 26). Specifically, this job description includes the duty to "provide accurate and timely customer billing/inspection" under the goal of "Financial/Business Growth." (DOE 25, Dkt. 57-15). The job description for Courtneay's AOM position that she was hired for in 2014 includes an identical duty under the same goal. (DOE 26, Dkt. 57-16).

       *2. Ms. Malone is informed of Project Compass.*

Ms. Malone became aware of Project Compass in August of 2017 when she signed a Non-Disclosure Agreement regarding Project Compass. (DOE 101, Dkt. 57-26, at 30:10-14; DOE 10, Dkt. 57-6). As part of Project Compass, Ms. Malone was tasked with assessing employees in the AOM, SDM, and client ops director ("COD") roles. (DOE 101, Dkt. 57-26, at 32:6-14). Ms. Malone was supposed to assess employees based on six categories: Job Knowledge, Flexibility, Execution, Effectiveness, Business Skills and Problem Solving/Decision Making. (DOE 101, Dkt. 57-26, at 35:5-14; DOE 14, Dkt. 57-8). Xerox instructed Ms. Malone that these assessments were not to be done based on a person's potential, but on what the new SDM position would entail. (DOE 101, Dkt. 57-26, at 36:1-6).

       *3. Ms. Malone assessed Courtneay despite not being her supervisor nor having any daily interaction with her or her work.*

Ms. Malone did not directly supervise every employee that she assessed; as discussed *supra*, Ms. Malone did not supervise Courtneay, nor did she interact with her on a regular basis. (DOE 100, Dkt. 57-25, at 63:4-6, 63:15-64:8). Further, Ms. Malone did not speak to Courtneay's direct supervisor, Ms. Muncy, about Courtneay's performance prior to assessing her for Project Compass. (DOE 101, Dkt. 57-26, at 62:18-21). Ms. Malone conducted the original assessments for Project Compass in September of 2017. (DOE 14, Dkt. 57-8). The assessments for Project Compass were redone in January of 2018. (DOE 101, Dkt. 57-26, at 112:10-24; DOE 12, Dkt. 57-7; DOE 15, Dkt. 57-9). Ms. Malone again did not speak with Ms. Muncy regarding Courtneay's performance before reevaluating her. (DOE 101, Dkt. 57-26, at 62:22-24). Despite this "reassessment," Ms. Malone's

score for Courtneay did not change for any category in which she assessed her. (DOE 101, Dkt. 57-26, at 46:25-47:3). In three other instances, employees' scores changed, one of which improved. (DOE 101, Dkt. 57-26, at 47:4-14).

> 4. *During this process, Ms. Malone transferred and attempted to transfer numerous employees, but never attempted to transfer Courtneay.*

Ms. Malone, in assessing her candidates for the RIF and the positions available for the new SDMs, attempted to reclassify certain individuals to take them off the "Compass list" for the RIF. (DOE 21, Dkt. 57-12; DOE 22, Dkt. 57-13). One of these individuals was Brendan Lenehan. (DOE 21, Dkt. 57-12; DOE 22, Dkt. 57-13). In April of 2018, Ms. Malone and Xerox decided to keep Courtneay on the list to be terminated while individuals like Mr. Lenehan were removed from the termination list. (DOE 21, Dkt. 57-12).

### E. After Courtneay's Pregnancy Became High Risk in Late March 2018, She Filed for Short-Term Disability Leave in Late April 2018.

At the end of March 2018, Courtneay's 20-week doctor's appointment revealed complications with her baby. (DOE 100, Dkt. 57-25, at 92:16-18). Specifically, Courtneay's baby was diagnosed with stage 2 chronic kidney disease, or multicystic kidney disease. (DOE 100, Dkt. 57-25, at 98:1-4). As a result, Courtneay was moved to high-risk maternal fetal medicine to continue the monitoring of her pregnancy. (DOE 100, Dkt. 57-25, at 92:9-13). Courtneay informed Ms. Muncy by phone immediately after this appointment of her pregnancy complications. (DOE 100, Dkt. 57-25, at 92:4-7).

Shortly after, on March 26, 2018, Ms. Muncy informed Ms. Malone that Courtneay had complications with her pregnancy and was now categorized as a high-risk pregnancy. (DOE 102, Dkt. 57-27, at 90:9-12; DOE 18, Dkt. 57-10). After her doctor's appointment on April 25, 2018 where her physician found additional health issues with her baby, Courtneay told Ms. Muncy that her doctor had recommended medical leave to reduce her stress and anxiety. (DOE 19, Dkt. 57-11; DOE 103, Dkt. 57-28, at ¶ 10). On April 25, 2018, Ms. Malone conversed with Ms. Tammy Leger, a

7

program manager for Project Compass, via computer instant messaging regarding Courtneay, stating: "Courtneay is pregnant, there are issues with baby and Sally [Muncy] told me tonight she may be going on leave of absence. ugh…" (DOE 24, Dkt. 57-14).

On April 30, 2018, Courtneay emailed Ms. Muncy regarding her doctor's recommendation of short-term disability leave for her high-risk pregnancy. (DOE 19, Dkt. 57-11). Her doctor was very concerned with Courtneay's stress and anxiety levels and mandated weekly appointments to monitor Courtneay's pregnancy. (*Id.*) Courtneay's high-risk pregnancy as well as her job duties at Xerox exacerbated her already elevated levels of stress and anxiety, which limited her ability to sleep, concentrate, think and communicate. (DOE 103, Dkt. 57-28, at ¶ 19). Courtneay's stress and anxiety levels, combined with her workload at Xerox, was a lot for her to handle on a daily basis. (DOE 100, Dkt. 57-25, at 94:23-95:3). Courtneay informed Ms. Muncy in this email that she had contacted the Xerox Integrated Absence Program ("XIAP") to assist with her leave request made on April 30, 2018.[6] (DOE 19, Dkt. 57-11). Also in this email exchange, Ms. Malone confirmed with Ms. Leger that regardless of Courtneay's application for short term disability and medical leave, Ms. Malone should still terminate Courtneay's employment the following day. (DOE 19, Dkt. 57-11).

After contacting XIAP on April 30, 2018 to request short-term disability leave, Courtneay completed and submitted an online questionnaire related to her short-term disability that same day. (DOE 32, Dkt. 57-18; DOE 100, Dkt. 57-25, at 105:8-106:3). Courtneay identified her "First Date of Disability" as August 10, 2018; when her baby was due. (DOE 32, Dkt. 57-18, at D-000424; DOE 100, Dkt. 57-25, at 106:4-10).

---

[6] This may be a material fact in dispute. Defendants incorrectly claim that Courtneay requested leave *after* she was notified of her termination. [Dkt. 49 at 29]. The evidence is plain and clear that she contacted XIAP on April 30, 2018 regarding her leave request, as well as completed the online questionnaire on April 30, 2018. (DOE 19, Dkt. 57-11; DOE 32, Dkt. 57-18). If Xerox continues to dispute this timeline, then this is a material fact in dispute.

This was the first time Courtneay had ever applied for any type of leave from work. She was not familiar with short-term disability leave, how to file for such leave, or the questions involved in filing for such leave. (DOE 103, Dkt. 57-28, at ¶¶ 13 and 15). Courtneay knew her short-term disability leave was related to her high-risk pregnancy and therefore put her expected due date as the first date of her disability. (DOE 103, Dkt. 57-28, at ¶ 17). Courtneay intended to begin her leave as soon as it was approved. (DOE 103, Dkt. 57-28, at ¶ 18). On May 9, 2018, Courtneay's disability leave forms were revised to indicate that her medical leave should begin on May 1, 2018. (DOE 100, Dkt. 57-25, at 135:24-136:4; DOE 33, Dkt. 57-19).

Courtneay's short-term disability leave began on May 1, 2018. (DOE 100, Dkt. 57-25, at 142:6). Courtneay's short-term disability leave qualified as FMLA leave. (DOE 100, Dkt. 57-25, at 107:7-9, 133:24-134:1; DOE 34, Dkt. 57-20, at D-000354). The first twelve weeks of Courtneay's leave were designated as FMLA, ending July 30, 2018. (DOE 35, Dkt. 57-21, at D-000259). Courtneay's short-term disability leave ran through September 30, 2018. (DOE 100, Dkt. 57-25, at 133:18-20). Courtneay was ready and willing to go back to work at Xerox after the birth of her child. (DOE 100, Dkt. 57-25, at 96:25-97:4).

**F.  Ms. Malone Terminated Courtneay on May 1, 2018.**

On May 1, 2018, one day after Courtneay requested short-term disability leave, Ms. Malone called Courtneay by telephone and terminated her employment effective immediately. (DOE 100, Dkt. 57-25, at 109:2-7). When Courtneay asked if any other positions at Xerox were available, Ms. Malone told her no. (DOE 100, Dkt. 57-25, at 109:25-110:10). Ms. Malone told Courtneay that all AOM positions were eliminated. (DOE 100, Dkt. 57-25, at 111:12-15).

Prior to her termination, Courtneay had no indication or knowledge that a RIF was being implemented. (DOE 100, Dkt. 57-25, at 114:7-11). After Ms. Malone terminated Courtneay, Courtneay called Ms. Muncy to inform her of the termination. (DOE 100, Dkt. 57-25, 116:4-7). During this call, Ms. Muncy told Courtneay to contact a lawyer and not to sign or respond to

anything. (DOE 100, Dkt. 57-25, at 116:8-23). In a text conversation later that day, May 1, 2018, Ms. Muncy informed Courtneay that contrary to what Ms. Malone told Courtneay, not all AOMs were terminated, but only two were terminated. (DOE 100, Dkt. 57-25, 118:6-11). Ms. Muncy further informed Courtneay that besides her and the other terminated AOM, all other AOMs were moved to different job titles. (DOE 100, Dkt. 57-25, at 118:12-16). The new title was the newly formed SDM position. (DOE 101, Dkt. 57-26, at 29:1-11).

### G.  Ms. Malone Assessed Other RIF Candidates Differently than Courtneay.

As discussed *supra*, Ms. Malone allegedly assessed the RIF candidates based on six categories.[7] (DOE 101, Dkt. 57-26, at 35:5-14; DOE 14, Dkt. 57-8). Further, Xerox allegedly designed these assessments to rate the individual employee's skills as they related to the new role, not the employee's potential to grow.[8] (DOE 101, Dkt. 57-26, at 36:1-6). Ms. Malone claimed Courtneay's billing work did not translate to the skills required for the new SDM position.[9] (DOE 101, Dkt. 57-26, at 65:2-12; DOE 14, Dkt. 57-8). Ms. Malone admitted that Courtneay "was good [at her job]," and indeed, Courtneay received a performance award for the first quarter of 2018. (DOE 101, Dkt. 57-26, at 65:2-12, 90:18-91:4). Nonetheless, Ms. Malone claimed that billing was not a component of the new SDM position.[10] (DOE 101, Dkt. 57-26, at 113:9-14).

Ms. Malone did not assess Mr. David Given—who was also an AOM that reported to Ms. Muncy—using the same method. Mr. Given and Courtneay had the same job description and the same basic job duties. (DOE 101, Dkt. 57-26, at 82:15-23). Ms. Malone gave Mr. Given a low assessment score based on his poor performance, and he was selected for the RIF based solely on his poor performance. (DOE 101, Dkt. 57-26, at 75:16-21, 78:1-4, 90:8-16, 155:3-9).

---

[7]  This is a material fact in dispute.
[8]  This is a material fact in dispute.
[9]  This is a material fact in dispute.
[10] This is a material fact in dispute.

### H. Xerox Had at Least One Position Available for Which Courtneay Was Qualified, But Xerox Did Not Transfer or Offer to Transfer Her to the Open Position.

One of Courtneay's co-workers who also held an AOM position, Ms. Gabrielle Joubert, planned to vacate her job on May 31, 2018. (DOE 101, Dkt. 57-26, at 69:19-22). Ms. Joubert also reported directly to Ms. Muncy. (DOE 101, Dkt. 57-26, at 75:16-21; DOE 104, Dkt. 57-29, at ¶ 4). Courtneay and Ms. Joubert were team members and interacted daily in their work, depending on the clients' needs. (DOE 100, Dkt. 57-25, at 68:12-14; DOE 104, Dkt. 57-29, at ¶¶ 4 and 5). Courtneay helped onboard Ms. Joubert and assisted her in her job. (DOE 100, Dkt. 57-25, at 68:12-69:3). Ms. Joubert worked onsite in Cincinnati, Ohio approximately three days a week to perform her AOM duties. (DOE 100, Dkt. 57-25, at 67:17-68:1). Ms. Joubert had materially the same job description as Courtneay. (DOE 101, Dkt. 57-26, at 82:15-23). Even though they primarily focused on different aspects of the client's needs, Courtneay and Ms. Jourbert were cross-trained on each other's jobs. (DOE 100, Dkt. 57-25, at 68:15-25; DOE 104, Dkt. 57-29, at ¶ 6). If one of them was out of town or needed assistance, the other provided back-up and support. (DOE 100, Dkt. 57-25, at 6815-25; DOE 104, Dkt. 57-29, at ¶6).

Before Xerox imposed the mandatory RIF as part of Project Compass, Xerox offered a voluntary reduction-in-force ("VRIF"). (DOE 101, Dkt. 57-26, at 49:13-22). The VRIF was offered in quarter 1 ("Q1") of 2018, and those who were selected were informed in mid-March of 2018. (DOE 101, Dkt. 57-26, at 49:25-50:19). Ms. Joubert applied for the VRIF on March 9, 2018, and was offered a VRIF package, which she accepted, and her final day of employment was May 31, 2018. (DOE 38, Dkt. 57-24; DOE 101, Dkt. 57-26, at 66:20-67:2; DOE 104, Dkt. 57-29, at ¶¶ 1 and 2). Because Ms. Joubert was not counted in the total number of employees terminated in the RIF, Xerox backfilled, or replaced, her position with another individual. (DOE 101, Dkt. 57-26, at 67:14-68:3).

Ms. Malone testified that she could not transfer or hire Courtneay to backfill Ms. Joubert's position because Xerox allegedly required an individual to apply for such a position.[11] (DOE 101, Dkt. 57-26, at 70:15-71:5). Courtneay had no indication or knowledge that a RIF was occurring at Xerox prior to her termination on May 1, 2018, because of the confidential nature of Project Compass. (DOE 100, Dkt. 57-25, at 114:7-11). Courtneay loved her job and had no reason to believe it would be necessary to apply for any other position at Xerox. (DOE 100, Dkt. 57-25, at 162:20-24). After her termination, Courtneay sent a text message to Ms. Muncy expressing her desire to be back at Xerox and how she would be willing to fill any open position. (DOE 100, Dkt. 57-25, at 160:1-7; DOE 37, Dkt. 57-23). Ms. Joubert's position had not been filled at the time of Courtneay's termination even though on May 1, 2018, the day Courtneay was terminated, Xerox sent an offer letter to Yolanda Smith for Ms. Joubert's job. (DOE 100, Dkt. 57-25, at 158:16-159:3).

Contrary to Xerox's alleged policy, which purportedly required an individual to apply for an open position before his or her hire,[12] Ms. Malone discussed hiring Yolanda Smith via instant message on April 25, 2018 with Ms. Tammy Leger before posting Ms. Joubert's open position. (DOE 101, Dkt. 57-26, at 148:9-16; DOE 24, Dkt. 57-14).  Specifically, Ms. Muncy messaged Ms. Leger: "I need to get Gab's replacement hired. *We are working to get posting up. We are planning to hire Raymond Smith's wife.*" (DOE 24, Dkt. 57-14, emphasis added). Immediately before this exchange, Ms. Malone and Ms. Leger discussed Courtneay's pregnancy, the issues with her baby, and the potential need for Courtneay to take leave. (DOE 24, Dkt. 57-14).

Before Ms. Smith's hire, Ms. Muncy had a casual conversation with Ms. Smith's husband, and through this connection, reached out to Ms. Smith, interviewed her, and decided she was a good fit for the position. (DOE 101, Dkt. 57-26, at 148:17-23). Xerox offered Ms. Smith the AOM

---

[11] This is a material fact in dispute.
[12] This is a material fact in dispute.

position to replace Ms. Joubert on May 1, 2018. (DOE 102, Dkt. 57-27, at 74:4-6; DOE 101, Dkt. 57-26, at 148:14-16; DOE 36, Dkt. 57-22).

Even before the job posting was up, if it was ever actually posted,[13] Ms. Malone planned to hire Ms. Smith; all the while Courtneay was not considered, according to Ms. Malone, simply because she never applied. (DOE 101, Dkt. 57-26, at 148:24-149:5, 152:21-24). As of the date of Courtneay's termination, May 1, 2018, Ms. Smith had not yet been officially hired, but Courtneay was still not considered to replace Ms. Joubert. (DOE 102, Dkt. 57-27, at 74:7-21).

Ms. Muncy claims she did not consider Courtneay for Ms. Joubert's position because the position was onsite in Cincinnati, Ohio. (DOE 102, Dkt. 57-27, at 74:19-24). Neither Ms. Muncy, nor Ms. Malone, ever asked Courtneay if she would be willing to relocate to Cincinnati, Ohio if it meant keeping her job with Xerox. (DOE 102, Dkt. 57-27, at 74:25-75:2; DOE 101, Dkt. 57-26, at 86:24-87:1). Ms. Smith had never worked at Xerox prior to her hire in May of 2018. (DOE 102, Dkt. 57-27, at 217:5-6). Courtneay had more understanding of Ms. Joubert's position at Xerox than Ms. Smith did at the time Ms. Smith was hired. (DOE 102, Dkt. 57-27, at 82:2-24). Courtneay was capable of performing the job vacated by Ms. Joubert. (DOE 102, Dkt. 57-27, at 85:13-16).

## III.   LEGAL ARGUMENT

### A. A Reasonable Jury Could Find that Xerox Terminated Courtneay in Violation of Title VII When It Terminated Her on the Basis of Her Sex, Which Includes Pregnancy, and Her Disability.

On summary judgment, Courtneay is entitled to "the benefit of conflicts in the evidence and any reasonable inferences in [her] favor." *Perez v. Thorntons, Inc.*, 731 F.3d 699, 700 (7th Cir. 2013). "[A]ll evidence belongs in a single pile and must be evaluated as a whole . . . ." *Volling v. Kurtz Paramedic Servs.*, 840 F.3d 378, 383 (7th Cir. 2016). Further, "[r]elevant evidence must be considered and irrelevant evidence disregarded, but **no evidence should be treated differently from other**

---

[13] This is a material fact in dispute.

**evidence because it can be labeled 'direct' or 'indirect.'** The sole question that matters is whether a reasonable juror could conclude that [the employee] would have kept her job if [the employee] had a different [gender], and everything else remained the same." *Rivers v. Goodwill of Cent. & S. Ind., Inc.*, No. 1:18-cv-01017-TWP-MPB, 2020 WL 1508893, at *5 (S.D. Ind. Mar. 30, 2020) (emphasis added) (citing *Ortiz*, 834 F.3d at 764). Significantly, "[a]n employer violates Title VII when it intentionally fires an individual employee based in part on sex," and "[i]t doesn't matter if other factors besides the plaintiff's sex contributed to the decision." *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731, 1741 (2020).

"To establish a violation of the ADA, the employee must prove '1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation.'" *Santos-Means v. Sheriff's Office of Cook Cnty.*, No. 12 CV 8804, 2016 U.S. Dist. LEXIS 144649, at *10–13 (N.D. Ill. Oct. 19, 2016) (citing *Winsley v. Cook Cty.*, 563 F.3d 598, 603 (7th Cir. 2009)). Here, Xerox does not dispute that Courtneay was qualified to perform the essential functions of the job with or without reasonable accommodation. Thus, the only issues for the Court to analyze at summary judgment on her ADA discrimination claim are whether Courtneay was (1) disabled and (2) whether she was terminated based on her disability.[14]

---

[14] Although Courtneay is not required to proceed under *McDonnell Douglas*, Xerox appears to assume this is necessary, as it argues that Courtneay cannot establish a "prima facie" case. [*E.g.* Dkt. 49 at 28]. For her Title VII claim, Xerox does not dispute that Courtneay (1) belongs to a protected class (as a pregnant woman); (2) she met Xerox's "legitimate expectations;" or that (3) she suffered an adverse action (i.e., the termination of her employment). *Brock v. U.S. Steel Corp.*, 2011 WL 3443954, at *6 (N.D. Ind. Aug. 8, 2011). Thus, even if Courtneay were to proceed under *McDonnell Douglas*, Xerox only disputes whether it treated a similarly situated person outside Courtneay's protected class more favorably. *Id.* Courtneay already addresses similarly situated individuals in Section 2 below. Under her ADA claim, Courtneay would only need to additionally show she was a member of a protected class, which is again already addressed in Section 1. Thus, even if Courtneay relied on *McDonnell Douglas*, which she does not, she could still meet the prima facie requirements.

In considering the totality of the evidence, a jury could readily conclude that Xerox discriminated against Courtney on the basis of her sex and her disability.

### 1. *Courtneay was qualified as disabled under the ADA.*

Xerox asserts that Courtney's "testimony clearly establishes that the stress and anxiety she experienced were not distinguishable from her pregnancy and did not impact any major life activities." [Dkt. 49 at 26]. Nonetheless, this ignores applicable case law as well as Xerox's own admission that Courtneay had a "high-risk pregnancy." [Dkt. 49 at 25-26]. At a minimum, Xerox regarded Courtneay as disabled, and she was therefore entitled to the protections of the ADA.

#### a. *Courtneay had a qualifying disability: a high-risk pregnancy.*

A disability is defined by the ADA as: "(A) a physical or mental impairment that substantially limits one or more major life activities of [an] individual; (B) as record of such impairment; or (C) being regarded as having such an impairment." *Richardson v. Chicago Transit Auth.*, 926 F.3d 881, 886 (7th Cir. 2019). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Adirieje v. ResCare, Inc.*, 2019 WL 4750037, at *8 (S.D. Ind. Sept. 30, 2019) (quoting 42 U.S.C. § 12102(2)(A)). This list is not exhaustive; a wide range of conditions related to pregnancy may be covered disabilities due to the American's with Disabilities Act Amendments Act of 2008 ("ADAAA"); the regulations to the ADAAA highlight that the legal definition of disability should be "inclusive." 29 C.F.R. 1630.1(c). Even activities such as sitting, reaching, and interacting with others are considered major life activities under the ADAAA regulations. *Id.* at 1630.2(i).

The stress and anxiety caused by Courtney's job at Xerox caused her doctor to mandate weekly appointments to monitor her and her baby. (DOE 19, Dkt. 57-11).). Courtney's high-risk pregnancy, which added to these elevated levels of stress and anxiety already caused by her job at Xerox, limited her ability to sleep, concentrate, think and communicate. (DOE 103, Dkt. 57-28, at ¶

15

19). These conditions are directly related to Courtneay's high-risk pregnancy. Courtneay's high-risk pregnancy clearly limited her major life activities, qualifying her as an individual with a disability under the ADA.

As Xerox recognizes, Courtneay's pregnancy was "high risk"—a "high-risk pregnancy" is obviously not a "normal" pregnancy. Courtneay's pregnancy was not the type of "normal" pregnancy that is excluded from the protections of the ADA. Indeed, "[p]regnancy-related conditions have typically been found to be impairments where they are not part of a 'normal' pregnancy," including "[s]usceptibility to a miscarriage." *Spees v. James Marine, Inc.*, 617 F.3d 380, 397 (6th Cir. 2010) (citing *Cerrato v. Durham*, 941 F. Supp. 388, 393 (S.D.N.Y. 1996); *Soodman v. Wildman, Harrold, Allen & Dixon*, No. 95 C 3834, 1997 U.S. Dist. LEXIS 1495, 1997 WL 106257, at *6 (N.D. Ill. Feb. 10, 1997)). *Accord Adirieje v. ResCare, Inc.*, No. 1:18-cv-01429-TWP-DLP, 2019 U.S. Dist. LEXIS 170125, at *23-26 (S.D. Ind. Sep. 30, 2019).

Furthermore, contrary to Xerox's assertion that "the stress and anxiety she experienced were not distinguishable from her pregnancy and did not impact any major life activities," completely ignores the contents of Courtneay's medical records. These medical records demonstrate that several daily life activities were impacted, including her ability to "sleep[]" and "communicat[e]" with others. (DOE 39[15] at DellaValle-Jones-000899 ("[Courtneay] states she is still having daily anxiety, worried about baby, 'what if', decreased appetite, difficult sleeping, racing thoughts, crying.")) (42 U.S.C. § 12102(2)(A).

    *b.  Courtneay was perceived as disabled.*

Even if Courtneay was not disabled according to the ADA, Xerox and Ms. Malone still perceived her as disabled. "Under the ADA, employers may not discriminate against employees that have either actual disabilities, [42 U.S.C.] § 12102(1)(A), or perceived disabilities, *id.* §

---

[15] DOE 39 is not hyperlinked to a specific docket due to this exhibit being filed under seal based on its confidential and person nature.

12102(1)(C). *See Ragan v. Jeffboat, LLC*, 149 F.Supp.2d 1053, 1062–63 (S.D.Ind.2001) (explaining that the ADA prohibits discrimination against employees with both 'actual disabilit[ies]' and 'perceived disabilit[ies]')." *Foos v. Taghleefe Indus., Inc.*, 132 F. Supp. 3d 1034, 1052 (S.D. Ind. 2015). An employee is regarded as being disabled if either "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." *Dyke v. O'Neal Steel, Inc.*, 327 F.3d 628, 632 (7th Cir. 2003) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999)).

Courtneay informed Ms. Muncy of her high-risk pregnancy in late March 2018. (DOE 100, Dkt. 57-25, at 92:4-7, 16-18). On March 26, 2018, Ms. Muncy then informed Ms. Malone that Courtneay had complications with her pregnancy and her pregnancy was categorized as high risk. (DOE 102, Dkt. 57-27, at 90:9-12; DOE 18, Dkt. 57-10). On April 25, 2018, five (5) days **before** Courtneay's request for short-term disability leave, Ms. Malone stated: "Courtneay is pregnant, there are issues with baby and Sally told me tonight she may be going on leave of absence. ugh…" (DOE 24, Dkt. 57-14). Ms. Malone knew about Courtneay's high risk pregnancy at the end of March and was aware of the need for Courtneay to take leave by April 25, 2018. (DOE 18, Dkt. 57-10; DOE 24, Dkt. 57-14).

Contrary to Xerox's argument that simply because Ms. Malone had knowledge of Courtneay's high-risk pregnancy that led to her leave does not suggest she was perceived as disabled, Ms. Malone also was also aware that Courtneay may need to take leave. (DOE 24, Dkt. 57-14). As discussed above, Xerox and Ms. Malone were well aware of Courtneay's pregnancy, when her pregnancy became high-risk, and when she was necessarily going to need to take leave, such that she was disabled or perceived as disabled. This is further supported by the fact that Xerox actually approved Courtneay's short term disability when she applied for it on April 30, 2018. (DOE 34, Dkt. 57-20; DOE 35, Dkt. 57-21).

In recognizing that Courtneay may need to take leave, Ms. Malone and Xerox believed that Courtneay's high-risk pregnancy substantially limited one or more major life activities such that she could not work. Courtneay has shown, or at least raised issues of fact, that she was a qualified individual under the ADA.

### 2. *Xerox treated similarly situated non-disabled, non-pregnant employees more favorably than Courtneay.*

Xerox asserts that Courtneay "cannot refute the fact that nondisabled and non-pregnant employees were also let go as part of Project Compass," and "Mr. Given, a non-pregnant/non-disabled employee, was also laid off as a part of Project Compass." [Dkt. 49 at 26-27]. Xerox ignores that there is a material fact in dispute as to whether others were treated more favorably than Courtneay because Ms. Malone moved several employees to difference positions before imposing the involuntary RIF but did not transfer or offer to transfer Courtneay to the position soon to be vacated by Ms. Joubert.

"In the usual case a plaintiff must at least show that the comparators (1) 'dealt with the same supervisor,' (2) 'were subject to the same standards,' and (3) 'engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) (quoting *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008)). "This is not a 'magic formula,' however, and the similarly-situated inquiry should not devolve into a mechanical, 'one-to-one mapping between employees.'" *Coleman* at 847.

Xerox treated Courtneay less favorably than similarly situated, non-pregnant, and non-disabled employees at Xerox, including her co-worker Mr. David Given. Mr. Given and Courtneay both operated in the AOM position at Xerox. (DOE 100, Dkt. 57-25, at 26:14-17; DOE 101, Dkt. 57-26, at 78:1-4). Courtneay and Mr. Given also had the same supervisor, Ms. Sally Muncy. (DOE 101, Dkt. 57-26, at 75:16-21; DOE 100, Dkt. 57-25, at 63:4-6). Further, the basic job duties of Mr.

Given and Courtneay were the same, and they had the same job description. (DOE 101, Dkt. 57-26, at 82:15-23).

Despite these similarities, Ms. Malone assessed Mr. Given differently than Courtneay when considering individuals to terminate as part of the RIF. Ms. Malone assessed Mr. Given based solely on his performance (DOE 101, Dkt. 57-26, at 90:8-16, 155:3-9), while Ms. Malone evaluated Courtneay using a much harsher metric: whether her current job skills could translate to the new SDM position, not how well she was performing her current job. (DOE 101, Dkt. 57-26, at 36:1-6; 65:2-12). Given Ms. Malone's disparate treatment of Courtneay, the fact that Ms. Malone also selected Mr. Given for a RIF does not excuse Xerox's discriminatory conduct against Courtneay. If Ms. Malone had assessed Courtneay in the same manner that she evaluated Mr. Given, her performance for which she had just been nominated for an award for the quarter prior to her termination, would not have justified Xerox's termination of her employment. (DOE 6, Dkt. 57-2; DOE 7, Dkt. 57-3; DOE 8, Dkt. 57-4; DOE 9, Dkt. 57-5; DOE 101, Dkt. 57-26, 90:18-91:4).

Moreover, Ms. Malone transferred several employees under her authority to open positions before imposing the involuntary RIF. For example, Brendan Lenehan, who worked as an AOM was allowed to take a position as one of the newly formed SDMs. (DOE 21, Dkt. 57-12). Even though Ms. Malone knew that Ms. Joubert was vacating her job at the end of May, 2018, Ms. Malone offered the job to Yolanda Smith, a non-pregnant, non-disabled individual, who had never worked at Xerox and without even posting the position. Ms. Malone and Xerox never transferred or offered to transfer Courtneay to this open position.

Because Courtneay was a qualified individual with a disability, and Xerox treated other non-pregnant, non-disabled employees more favorably, Defendants' Motion for Summary Judgment should be denied in its entirety.

19

### 3. A reasonable jury could infer a causal link between Courtneay's pregnancy or disability and Xerox' termination of Courtneay.

Although Xerox asserts that "the undisputed facts establish that [Courtneay] was selected for layoff prior to both her pregnancy and her purported request for short-term disability leave," this ignores the numerous delays before Courtneay's employment was terminated and the changes Ms. Malone was making as late as April 19 and 23, 2018 to the persons who would actually be RIF'd. Xerox was well aware of Courtneay's pregnancy and request for short-term disability before the final decision to terminate her employment was made.

Under Title VII and the ADA, "an admission of guilt" is unnecessary; instead, an employee only needs to "show that her disability [or pregnancy] 'played a role in the employer's decision-making process and had a determinative influence on the outcome.'" *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. Ind. 2014) (citation omitted).

Ms. Malone was aware of all relevant issues with Courtneay's high-risk pregnancy prior to terminating her on May 1, 2018. (DOE 24, Dkt. 57-14; DOE 102, Dkt. 57-27, at 90:9-12). Further, Ms. Malone was aware that Ms. Joubert was participating in the VRIF and the open position that was available, the same general AOM position as Courtneay's position. (DOE 101, Dkt. 57-26, 66:20-67:2, 69:19-22). Although Courtneay was admittedly qualified for this position, Xerox never transferred or offered to transfer Courtneay or asked if she would be willing to relocate to Cincinnati, Ohio, to move closer to Cincinnati, Ohio or to commute to Cincinnati, Ohio to fill Ms. Joubert's onsite position. (DOE 102, Dkt. 57-27, at 74:25-75:2; DOE 101, Dkt. 57-26, at 86:24-87:1). Courtneay admittedly had more understanding of the position than Ms. Yolanda Smith, the individual hired to replace Ms. Joubert. (DOE 102, Dkt. 57-27, at 82:2-24).

As a result, a reasonable jury could find that Courtneay's termination occurred because of her gender and/or her disability. The Court should therefore deny Defendants' Motion for Summary Judgment on Courtneay's Title VII and ADA retaliation claims in their entirety.

**B. Xerox Retaliated Against Courtneay on the Bases of Her Gender as well as Her Disability When It Terminated Courtneay after She Filed for Short-Term Disability Leave.**

To establish a retaliation claim, Courtneay must show she (1) engaged in a statutorily protected activity; (2) suffered an adverse action; and (3) a causal connection between the two existed. *Edson v. Dreyer & Reinbold Inc.*, No. 1:15-cv-00861-TWP-MJD, 2016 U.S. Dist. LEXIS 183398, at *8 (S.D. Ind. Dec. 13, 2016) (quoting *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011)). Xerox does not dispute that Courtneay suffered an adverse action.

Thus, the issues for the Court to analyze at summary judgment on Courtneay's Title VII and ADA retaliation claims are whether Courtneay: (1) engaged in a statutorily protected activity; and (2) whether a causal connection between a statutorily protected activity and the adverse actions existed. Xerox disputes that a statutorily protected activity occurred because Courtneay only makes a "conclusory allegation that her request for short-term disability leave constituted protected activity under the ADA and Title VII," and no causal connection exists because "the undisputed facts establish that she was selected for layoff prior to both her pregnancy and her purported request for short-term disability leave." [Dkt. 49 at 28-31].

Neither of these assertions are accurate: Courtneay clearly had a disability in need of accommodation, Xerox was clearly aware of Courtneay's high-risk pregnancy and the potential need for short-term disability, and case law demonstrates that a request for short term disability **is** protected activity.

   1. *Courtneay engaged in statutorily protected activity under the ADA and Title VII by requesting short-term disability leave.*

   a. *By no later than April 30, 2018—when Courtneay formally requested short-term disability, Courtneay engaged in statutorily protected activity under the ADA.*

On April 25, 2018, after Courtneay's doctor's appointment and after learning about additional health issues with her baby, Courtneay told Ms. Muncy that her doctor recommended that

21

she take medical leave to lessen the stress and anxiety caused by her job and to focus on taking care of herself and her baby. (DOE 19, Dkt. 57-11; DOE 103, Dkt. 57-28, at ¶ 10). Ms. Muncy summarized how Courtneay could apply for short term disability. (DOE 103, Dkt. 57-28, at ¶ 10). That same day, Ms. Malone told Ms. Leger in HR: "Courtneay is pregnant, there are issues with baby and Sally [Muncy] told me tonight she may be going on leave of absence. ugh…" (DOE 24, Dkt. 57-14). Thus, on April 25, 2018, when Ms. Malone acknowledged that Courtneay may need to take leave, or by April 30, 2018, when Courtneay formally requested short-term disability, Courtneay engaged in statutorily protected activity under the ADA because her request for short term disability was a request for an accommodation.[16]

Accordingly, on April 25, 2018 (or by no later than April 30, 2018), Courtneay engaged in protected activity under the ADA by requesting short-term disability.

> b. *Courtneay engaged in statutorily protected activity under Title VII when she requested short-term disability leave.*

Protected activity under Title VII as amended by the Pregnancy Discrimination Act ("PDA") is not limited to the typical activity associated with a race, gender, religion or national origin retaliation claim. Protected activity under the PDA can also include requesting a reasonable accommodation, similar to an ADA retaliation claim. *See generally Serednyj v. Beverly Healthcare, LLC*, 656 F.3d 540 (7th Cir. 2011) (abrogated on other grounds by *Young v. United Parcel Services, Inc.*, 575 U.S. 206 (2015)). Therefore, on April 25, 2018 (or by no later than April 30, 2018), Courtneay engaged in protected activity under Title VII by requesting short-term disability because of her pregnancy.

---

[16] Because she had disclosed her disability, and her need for accommodation was apparent, or at minimum because Xerox perceived Courtneay as disabled, it was not necessary for Courtneay to explicitly request a disability "accommodation" to engage in protected activity under the ADA. *See generally Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. Ind. 2014). Ms. Malone and Xerox, based on their prior knowledge, should have understood this request to be a request for an accommodation under the ADA.

### 3.   A reasonable jury could infer a causal link between Courtneay's request for short-term disability leave and Xerox's termination of Courtneay.

As has been discussed *supra*, Ms. Malone was aware of all relevant issues with Courtneay's high-risk pregnancy prior to terminating her employment on May 1, 2018. (DOE 24, Dkt. 57-14; DOE 102, Dkt. 57-27, at 90:9-12). Further, Ms. Malone was aware that Ms. Joubert was participating in the VRIF and that her position was available, the same general AOM position as Courtneay's position. (DOE 101, Dkt. 57-26, at 66:20-67:2, 69:19-22). Although Courtneay was admittedly qualified for this position, Xerox never transferred or offered to transfer Courtneay or asked if she would be willing to relocate to Cincinnati, Ohio, move closer to Cincinnati, Ohio or commute to Cincinnati, Ohio, to fill Ms. Joubert's onsite position. (DOE 102, Dkt. 57-27, at 74:25-75:2; DOE 101, Dkt. 57-26, at 86:24-87:1). Courtneay admittedly had more understanding of the position than Ms. Yolanda Smith, the individual hired to replace Ms. Joubert. (DOE 102, Dkt. 57-27, at 82:2-24).

Ms. Malone was aware of the high probability that Courtneay would take leave in the near future during her conversation with Ms. Leger on April 25, 2018. (DOE 24, Dkt. 57-14). At a minimum, she was aware that Courtneay would be taken maternity leave in a few months. Ms. Malone was also aware of an open position for which Courtneay was qualified. Thus, a jury could infer that Ms. Malone did not want to offer a position to Courtneay because she was aware Courtneay would have to take leave for complications from her pregnancy or because of her pregnancy. Considering the evidence in a light most favorable to Courtneay, Courtneay's request for short-term disability sealed her fate that should would be terminated as part of the involuntary RIF. Ms. Malone and Xerox did not want to offer Courtneay an open position for which she was qualified because she would be on an extended leave. Instead, Xerox purposefully terminated Courtneay's employment after she requested short-term disability leave, as further evidence by Ms.

Malone's inquiry the night before to confirm she should move forward with the termination even though Courtneay had requested leave and was experiencing a high-risk pregnancy.

As a result, a reasonable jury could find that Xerox terminated Courtneay because she engaged in protected activity under the ADA and Title VII. The Court should therefore deny Defendants' Motion for Summary Judgment on Courtneay's Title VII and ADA retaliation claims in their entirety.

### C. Xerox Interfered with Courtneay's FMLA Rights When It Refused to Reinstate Her to the Open Position Vacated by Gabrielle Joubert.

"To succeed on an interference claim, [Courtneay] must show that (1) [she] was eligible for FMLA protections; (2) [Xerox] was covered by the statute; (3) [she] was entitled to take leave; (4) [she] provided sufficient notice of [her] intent to take leave; and (5) [Xerox] denied [Courtneay] FMLA benefits to which [she] was entitled." *Patrick v. Cowen*, 2016 WL 1460333, *7 (N.D. Ind. Apr.13, 2016) (citing *James v. Hyatt Regency Chicago*, 707 F.3d 775, 780 (7th Cir. 2013)). "[A]n interference claim only requires the employee to prove that the employer denied him entitlements provided by the [FMLA]." *Pagel v. TIN, Inc.*, 695 F.3d 622, 626 (7th Cir. 2012) (citing *Kauffman v. Fed. Express Corp.,* 426 F.3d 880, 884 (7th Cir. 2005)). Two of the five elements are satisfied in this case as a matter of law, as the first and second elements are not disputed. The core of this case then relates to the third, fourth and fifth elements of Courtneay's FMLA interference claim: whether Courtneay was entitled to leave; whether Courtneay provided sufficient notice of her intent to take leave; and whether Xerox denied Courtneay her FMLA benefits.

Defendants contend that Courtneay's FMLA claims fail because "(1) Xerox provided Plaintiff with all of the leave the FMLA requires and all of the leave that she requested; (2) Plaintiff did not request FMLA leave until several months after the decision to eliminate her position; (3) Plaintiff was not entitled to job restoration because she was unable to return to work at the conclusion of her leave;

and (4) Plaintiff's position would have been eliminated regardless of her request for FMLA leave." [Dkt. 49 at 34-37].

### 1. *Courtneay was entitled to FMLA protections.*

"To be entitled to FMLA leave, the employee must have suffered from a serious health condition that left [her] unable to perform the functions of [her] job." *Sahlhoff v. Gurley-Leep Auto. Mgmt. Corp.*, 136 F. Supp. 3d 1003, 1005 (N.D. Ind. 2015). As discussed *supra*, Courtneay's high-risk pregnancy and the coupled stress and anxiety limited her ability to perform her job such that she had to file for leave. Courtneay was also still an employee at the time of her leave request on April 30, 2018. Further, despite Defendants' argument that Courtneay was not "entitled" to FMLA leave simply because the decision to terminate her was allegedly made prior to her request for leave, Xerox still granted Courtneay's request for FMLA leave. It is illogical for Xerox to challenge Courtneay's entitlement to FMLA after it already granted Courtneay's request for FMLA leave.

For these reasons, Courtneay was entitled to FMLA protections.

### 2. *Courtneay provided sufficient notice to Xerox of her intent to take leave.*

To put Xerox on notice, Courtneay is "not required to specifically refer to the FMLA so long as she 'alert[ed] [her] employer to the seriousness of the health condition.'" *Nicholson v. Pulte Homes Corp.*, 690 F.3d 819, 826 (7th Cir. 2012) (quoting *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 725 (7th Cir. 2007). "The employee's duty is merely to place the employer on notice of a probable basis for FMLA leave. [S]he doesn't have to write a brief demonstrating a legal entitlement. [S]he just has to give the employer enough information to establish probable cause, as it were, to believe that [s]he is entitled to FMLA leave." *Aubuchon v. Knauf Fiberglass, GmbH*, 359 F.3d 950, 953 (7th Cir. 2004).

As discussed *supra*, Courtneay made Ms. Malone and Ms. Muncy (and therefore Xerox) aware of her pregnancy complications, doctor's recommendations and necessity for leave prior to filing for short-term disability leave. For example, after her appointment during which she initially learned of her pregnancy complications, Courtneay informed her supervisor, Ms. Muncy, of her

pregnancy complications. (DOE 100, Dkt. 57-25, at 92:4-7). Shortly thereafter, on March 26, 2018, Ms. Muncy informed Ms. Malone that Courtneay had complications with her pregnancy and was moved to a high-risk pregnancy status. (DOE 102, Dkt. 57-27, at 90:9-12; DOE 18, Dkt. 57-10). On April 25, 2018, Courtneay learned of further complications with her baby, and her doctor recommended that she take medical leave. (DOE 19, Dkt. 57-11; DOE 103, Dkt. 57-28, at ¶ 10). Immediately after this appointment, Courtneay advised Ms. Muncy that she would need to take medical leave, and Ms. Muncy told her how to apply. (DOE 103, Dkt. 57-28, at ¶ 10). Ms. Malone then told Ms. Tammy Leger in HR via instant messages that "Courtneay is pregnant, there are issues with baby and Sally told me tonight she may be going on leave of absence. ugh…" (DOE 24, Dkt. 57-14). Further, on April 30, 2018, Courtneay emailed Ms. Muncy regarding her doctor's suggestion of taking short-term disability leave for her high-risk pregnancy. (DOE 19, Dkt. 57-11).). Courtneay additionally informed Ms. Muncy in this email that she had contacted the Xerox Integrated Absence Program ("XIAP") to assist with her with her leave request made on April 30, 2018. (DOE 19, Dkt. 57-11).

Given these circumstances of Courtneay informing her supervisor of her condition, who in turn admittedly informed Ms. Malone who informed Ms. Legere in HR, as well as Courtneay's direct communication with XIAP, Xerox was sufficiently on notice that Courtneay intended to and did request FMLA qualifying leave.

### 3. *Xerox denied Courtneay FMLA benefits to which she was entitled, specifically reinstatement to the open position at Xerox given to Ms. Yolanda Smith.*

"Firing an employee to prevent her from exercising her right to return to her prior position can certainly interfere with that employee's FMLA rights." *Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010) (quoting *Simpson v. Office of the Chief Judge of the Circuit Court of Will County*, 559 F.3d 706, 712 (7th Cir. 2009). As argued above, Xerox had an open position available prior to terminating Courtneay. This position was held by Gabrielle Joubert that she was vacating on May 31,

2018, due to her accepting the VRIF. (DOE 101, Dkt. 57-26, 66:20-67:2, 69:19-22). Courtneay had the right to return to this open and available position after her FMLA and short-term disability leave concluded. Xerox and Ms. Malone instead terminated Courtneay, interfering with her FMLA rights.

### D. Xerox Violated the FMLA by Retaliating Against Courtneay for Her Short-Term Disability Leave, Which Was FMLA-Qualified Leave.

To show that Xerox retaliated against her in violation of the FMLA, Courtneay must show: "(1) [she] engaged in a protected activity; (2) [Xerox] took an adverse employment action against [her]; and (3) there is a causal connection between the protected activity and the adverse employment action." *Pagel*, 695 F.3d at 631 (citing *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 633 (7th Cir. 2009)). Xerox disputes whether Courtneay engaged in protected activity under the FMLA. Xerox took an adverse action against Courtneay when it terminated her employment after she requested short-term disability leave. Thus, at issue, is whether (1) Courtneay engaged in protected activity when she requested short-term disability leave and whether (2) there was a causal connection between Courtneay's request for FMLA-qualified leave and Xerox's termination of her employment.

Xerox asserts that Courtneay never engaged in protected activity, and "she cannot establish retaliatory intent or a causal connection between her purported protected activity and her selection for layoff." [Dkt. 49 at 38-41].

### 1. *Courtneay engaged in protected activity, and even if not, the circumstances of Courtneay's pregnancy provided Xerox with sufficient notice of the need for leave.*

"Once an employee informs his employer of his probable need for medical leave, the FMLA imposes a duty on the employer to conduct further investigation and inquiry to determine whether the proposed leave in fact qualifies as FMLA leave." *Jordan v. Marsh USA, Inc.*, No. 18 C 4327, 2019 U.S. Dist. LEXIS 190214, at *9 (N.D. Ill. Nov. 1, 2019) (quoting *Burnett v. LFW Inc.*, 472 F.3d 471, 480 (7th Cir. 2006)). *See Aubuchon*, 359 F.3d at 953 ('[The employee] just has to give the employer enough information to establish probable cause, as it were, to believe that he is entitled to

27

FMLA leave. That is enough to trigger the employer's duty to request such additional information …

as may be necessary to confirm the employee's entitlement.') (citing 29 C.F.R. §§ 825.302(c),

825.303(b), 825.305(d))." *Burnett v. LFW Inc.*, 472 F.3d 471, 480 (7th Cir. 2006). Further, an

employee may be excused from expressing such a need for medical leave "when circumstances

provide the employer with sufficient notice of the need for medical leave or when the employee is

incapable of providing such notice." *Byrne v. Avon Prods., Inc.*, 328 F.2d 379, 381-82 (7th Cir. 2003).

 The same circumstances argued above for the notice aspect of Courtneay's FMLA interference

apply here. Courtneay informed her supervisor, Ms. Muncy, of her pregnancy complications. (DOE

100, Dkt. 57-25, at 92:4-7). Shortly thereafter, on March 26, 2018, Ms. Muncy informed Ms. Malone

that Courtneay had complications with her pregnancy and was moved to a high-risk pregnancy. (DOE

102, Dkt. 57-27, at 90:9-12; DOE 18, Dkt. 57-10). On April 25, 2018, Courtneay learned of further

complications with her baby, and her doctor recommended that she take medical leave. (DOE 103,

Dkt. 57-28, at ¶¶ 9, 10). Immediately after this appointment, Courtneay advised Ms. Muncy that she

would need to take medical leave, and Ms. Muncy told her how to apply. (DOE 103, Dkt. 57-28, at ¶

10). Ms. Malone then told Ms. Tammy Leger in HR via instant messages that "Courtneay is pregnant,

there are issues with baby and Sally told me tonight she may be going on leave of absence. ugh…"

(DOE 24, Dkt. 57-14). Taken together with the email sent by Courtneay on April 30, 2018, and her

contact with XIAP, Courtneay has provided sufficient evidence that she engaged in protected activity

under the FMLA.

 Even if this weren't enough information to put Xerox on notice that Courtneay was entitled

to FMLA, the circumstances certainly provided Xerox with sufficient notice of the need for medical

leave. Courtneay was clearly pregnant, and Ms. Malone and Xerox were well aware of her high-risk

pregnancy and the likelihood she would need to take leave. (DOE 19, Dkt. 57-11; DOE 24, Dkt. 57-

14). Thus, Defendants' argument that Courtneay "has failed to show . . . that her request for

disability leave necessarily equates to a request for FMLA leave" is meritless and should be wholly rejected. [Dkt. 49 at 38-39].

With all reasonable inferences in Courtneay's favor, Courtneay has demonstrated that she engaged in protected FMLA activity, and Defendants were on notice of such activity, when she requested short-term disability leave on April 30, 2018.

> 2. *A reasonable jury could infer a causal link between Courtneay's FMLA protected activity and Xerox's termination of Courtneay's employment.*

To succeed on an FMLA retaliation claim, the plaintiff does not need to prove that "retaliation was the *only* reason for her termination; she may establish an FMLA retaliation claim by 'showing that the protected conduct was a substantial or motivating factor in the employer's decision.'" *Edson v. Dreyer & Reinbold Inc.*, No. 1:15-CV-00861-TWP-MJD, 2016 WL 11269418, at *6 (S.D. Ind. Dec. 13, 2016), *report and recommendation adopted*, No. 1:15-CV-00861-TWP-MJD, 2017 WL 443166 (S.D. Ind. Feb. 1, 2017) (quoting *Lewis v. School District #70*, 523 F.3d 730, 741–42 (7th Cir. 2008). Here, a reasonable jury could infer Courtneay's request for FMLA leave was a substantial factor in Xerox's ultimate decision to terminate her employment.

Defendants contend that Courtneay was selected for layoff prior to her request for FMLA leave, and because Ms. Malone made her initial assessments in September of 2017, Courtneay cannot bring her FMLA retaliation claim. [Dkt. 49 at 39]. Ms. Malone conducted her assessments again in January of 2018, and Project Compass was again delayed further into the Spring of 2018 before any terminations were decided or implemented. (DOE 101, Dkt. 57-26, at 112:10-24; DOE 12, Dkt. 57-7). As late as April 19, and 23, 2018, Ms. Malone was making changes to the persons who would actually be RIF'd. It was not until after Courtneay's pregnancy, high-risk status and necessity for leave became known that Xerox actually terminated her employment. Indeed, the night before Xerox terminated, Ms. Malone told HR: "Courtneay is pregnant, there are issues with baby and Sally [Muncy] told me tonight she may be going on leave of absence. ugh…" (DOE 24, Dkt. 57-14).

Defendants' citation to *Salameh v. Sears Holding Management Corporation*, 2010 WL 183361 (N.D. Ill. Jan. 23, 2010) is unavailing. Unlike Courtney, the plaintiff in *Salameh* "failed to identify any affirmative evidence to suggest that Sears viewed his FMLA negatively." *Id.* at *6. Here, for instance, Ms. Malone was aware of all relevant issues with Courtney's high-risk pregnancy prior to terminating her employment on May 1, 2018. (DOE 24, Dkt. 57-14; DOE 102, Dkt. 57-27, at 90:9-12). Further, Ms. Malone was aware that Ms. Joubert was participating in the VRIF and the open position that was available, which was Courtney's same AOM position at the time Xerox terminated her employment. (DOE 101, Dkt. 57-26, at 66:20-67:2, 69:19-22). Courtney could have filled Joubert's position if given the chance; however, no one ever approached Courtney or asked her if she would be willing to relocate to Cincinnati, Ohio, move closer to Cincinnati, Ohio or commute to Cincinnati, Ohio to fill Ms. Joubert's onsite position. (DOE 102, Dkt. 57-27, at 74:25-75:2; DOE 101, Dkt. 57-26, at 86:24-87:1). Courtney admittedly was better qualified for the position than Ms. Yolanda Smith, the individual hired to replace Ms. Joubert. (DOE 102, Dkt. 57-27, at 82:2-24).

Ms. Malone was aware of the high possibility that Courtney would request and/or take FMLA-qualifying leave during her conversation with Ms. Leger on April 25, 2018. (DOE 24, Dkt. 57-14). For these reasons, Ms. Malone did not want to offer a position to Courtney, or even explore the possibility of Courtney's transferring to this position, because the position would be vacant for as long as Courtney was on leave. This, coupled with the timing of Courtney's termination—one day after her request for leave—proves that Defendants retaliated against Courtney based on her request (or her anticipated request) for FMLA leave.

Viewing the evidence in a light most favorable to Courtney, Courtney's request for FMLA qualifying leave was a deciding factor in the termination of her employment at Xerox, and Defendants terminated Courtney's employment rather than considering her for an open position for which she was qualified. Defendants' Motion for Summary Judgment on Courtney's FMLA retaliation claim should therefore be denied in its entirety.

## V. CONCLUSION

Because material facts remain in dispute, and because a reasonable jury could find in

Courtneay's favor on all her claims, the Court should deny *Defendants' Motion for Summary Judgment* in

its entirety. [Dkt. 48]. Courtneay further requests all other just and proper relief.

Respectfully submitted,

*s/ Chad H. Holler*
Sandra L. Blevins, Atty. No. 19646-49
Chad H. Holler, Atty. No. 35253-49

*Attorneys for Plaintiff Courtneay A. DellaValle-Jones*

BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, Indiana 46204
Office: (317) 687-2222
Fax: (317) 687-2221
E-mail:  litigation@betzadvocates.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2021, a copy of the foregoing was filed electronically.

Notice of this filing will be sent to the following parties by operation of the Court's electronic filing

system. Parties may access this filing through the Court's system.

A. Nicole Adler
Jessica M. Thomas
THE KULLMAN FIRM
1100 Poydras Street, Suite 1600
New Orleans, LA

*s/ Chad H. Holler*
Chad H. Holler

31