UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

COURTNEAY A. DELLAVALLE-JONES,   )
                                 )
            Plaintiff,           )
                                 )
      v.                         )        No. 1:20-cv-00288-SEB-MJD
                                 )
XEROX CORPORATION, et al.        )
                                 )
            Defendants.          )

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendants' Motion for Summary Judgment

[Dkt. 48], filed pursuant to Federal Rule of Civil Procedure 56.  Plaintiff Courtneay A.

DellaValle-Jones has brought this action against her former employer, Defendant Xerox

Corporation, and Xerox's Vice President of Delivery, Defendant Lynne Malone, alleging

that Defendants violated her rights under the Americans with Disabilities Act of 1990, 42

U.S.C. § 12101, *et seq.* ("ADA"), as amended by the ADA Amendments Act of 2008

("ADAAA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

("Title VII"), as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C.

1981A ("PDA"), by discriminating against her on the basis of her disability and her

pregnancy, and retaliating against her after she filed for short-term disability leave

stemming from pregnancy complications.  Ms. DellaValle-Jones alleges that Defendants

also interfered with her rights under the Family and Medical Leave Act, 29 U.S.C. §

2601, *et seq.* ("FMLA") by failing to transfer her to an open position after she requested

FMLA-qualifying leave and retaliated against her for requesting such leave.  Defendants deny these allegations.

For the reasons detailed below, we GRANT Defendants' Motion for Summary Judgment.

## Factual Background

### I.     General Background

In June 2014, Ms. DellaValle-Jones began working for Xerox as an Account Operations Manager ("AOM") in its North America Operations, Service Delivery, HiTech Organization.  DellaValle-Jones Dep. at 26, 28–29.  She held this position throughout her employment with Xerox, and at all times during her employment performed her work remotely by computer from her home in Indianapolis, Indiana.

During her tenure with Xerox, Ms. DellaValle-Jones reported directly to Sally Muncy, a Client Operations Director ("COD"), who, in turn, reported to Defendant Lynne Malone, the Vice President of Client Operations for the HiTech Organization.  *Id.* at 63. Ms. Muncy conducted Ms. DellaValle-Jones's annual performance evaluations according to which Ms. Muncy never rated her lower than a "Meets Expectations" rating and often awarded her an "Exceeds all Expectations" rating.  Dkts. 57-2, 57-3, 57-4, 57-5 (Performance Reviews); Muncy Dep. at 150–156.

### II.     Plaintiff's Job Responsibilities

As an AOM, Ms. DellaValle-Jones's job responsibilities included managing and maintaining client relationships, services delivery operational leadership, personnel and resources management, customer-facing duties, on-site training, achieving contract

service level agreements, and maintaining customer satisfaction and financial/business growth. *Id.* at 39–40. Her daily tasks included ensuring that her onsite docucare associates were performing properly at their sites, coordinating break/fix tickets, service tickets, and supplies, ensuring that all devices were serviced and performing properly, confirming that move/add/change/device ("MACDs") requests were completed, and ensuring that her customers were kept satisfied. *Id.* at 48. She also completed Price Change Requests ("PCRs") and other reports, handled daily phone calls and project management, tracked new devices, and assisted colleagues as needed. *Id.* at 48–49.

Beginning in 2016, Xerox began assigning Ms. DellaValle-Jones additional responsibilities, including billing, project management, and daily customer interaction. *Id.* at 40. Specifically, at some point between 2016 and 2017, Ms. DellaValle-Jones was assigned to work with a team on the Proctor & Gamble ("P&G") account to assist with billing. Then, beginning in late 2017, Ms. DellaValle-Jones was also assigned to assist with the Medtronics account. These assignments were in addition to her regular AOM duties discussed above. Her responsibilities on the P&G and Medtronics accounts included helping to prepare the billing invoices and the backup reports for invoices,[1] assuring that the backup reports matched the invoices, and submitting all billing invoices by their specific deadlines. *Id.* at 46–47. According to Ms. DellaValle-Jones, she spent roughly 40% to 50% of her time completing these billing responsibilities in addition to her regular daily tasks as an AOM. *Id.* at 47. Ms. Muncy and Ms. Malone, however,

---

[1] Xerox bills its clients for office and production equipment as well as for other services, including triaging technical issues and delivering office supplies.

estimate that she spent closer to 90% to 95% of her time on billing.  Malone Dep. at 63;

Muncy Dep. at 55.

### III.   Defendant's Global Restructuring Project and Reduction in Force

In late summer of 2017, Xerox initiated "Project Compass," a global restructuring

effort that included a broad-based reduction in force ("RIF").  Specifically, a few

positions within Xerox's Service Delivery group, including the AOM role, were set to be

repurposed and realigned into a newly configured version of the Service Delivery

Manager ("SDM") position.  Additionally, as part of the Project Compass restructuring,

Xerox planned to reduce the number of employees who would remain employed in the

reconfigured SDM position by implementing a cost-cutting RIF impacting employees

occupying the pre-Project Compass AOM, COD, and SDM positions.  Malone Dep. at

40.

According to Ms. Malone, the reconfigured SDM position was to focus on account

management, client relationships, contract delivery, and partnering with their sales

organization, but did not include any billing duties, as those responsibilities were

reassigned to a shared services organization, United States Customer Business Operations

("USCBO"), in Guatemala.[2]  *Id.* at 36.  Ms. DellaValle-Jones disputes this explanation

based on a job description she received from Ms. Muncy, which Ms. DellaValle-Jones

believed set forth the duties for the reconfigured SDM position and included the duty to

"provide accurate and timely customer billing/inspection" under the goal of

---

[2] According to Defendants, the billing work that Xerox transferred to USCBO as part of the
Project Compass restructuring is currently still performed offshore.

"Financial/Business Growth," which was a goal also listed in Ms. DellaValle-Jones's pre-Project Compass AOM job description.  Dkt. 57-15 (Job Description); Malone Dep. at 149–50.  Ms. Muncy, however, has testified that the job description she provided Ms. DellaValle-Jones contained the duties and responsibilities for both the AOM role as well as the SDM position and was not the job description for the newly formed SDM position.  Muncy Dep. at 184–85.

Ms. Malone was first informed of Project Compass in August 2017 and was tasked with selecting for elimination five of the employees reporting to her in the COD, AOM, and/or SDM positions.  The Project Compass assessment that she was instructed to use to in evaluating these employees included the following six categories: job knowledge; flexibility; execution; effectiveness; business skills; and problem solving/decision making.  Every employee was given a numerical score in each category, which scores were added together to reach a total overall number for each employee.  All AOMs, CODs, and SDMs in the HiTech organization were assessed against one another and, per Xerox's instructions, Ms. Malone's assessments were to be conducted, not based on an employee's potential, but instead on how well their skills and abilities matched the job duties of the reconfigured SDM position.

Because all employees in the HiTech organization were eligible for termination, Ms. Malone was specifically prohibited from discussing the restructuring with anyone else in her organization or consulting her subordinates for assistance with the Project Compass assessment.  Accordingly, Ms. Malone did not speak with Ms. DellaValle-Jones's direct supervisor, Ms. Muncy, regarding her views on Ms. DellaValle-Jones's

performance or aptitude for the new SDM position before completing any of Ms. DellaValle-Jones's assessments.

On September 14, 2017, Ms. Malone submitted her employee assessments to Xerox.  Ms. DellaValle-Jones received the second-lowest score on the assessment and thus was one of the employees selected for layoff.  According to Ms. Malone, a major factor in her evaluation of Ms. DellaValle-Jones was the fact that though Ms. DellaValle-Jones had performed significant billing duties as an AOM, billing duties were not part of the reconfigured SDM role.  In addition to Ms. DellaValle-Jones, Ms. Malone identified the following employees for layoff: Brendan Lenehan, who was an AOM on the AT&T account; Beth Palmer, an AOM on the Microsoft account; Kimberly Hughes, an AOM on the Northrup Grumman Account; and Leslee Thompson, an AOM on the Medtronics account.  At some point after Ms. Malone submitted her assessments, Xerox made the decision to delay implementation of Project Compass and the related RIF, so none of the employees evaluated by Ms. Malone in September 2017 were laid off at that time.

Ms. Malone updated her Project Compass assessments in January 2018, submitting her revised assessments to Xerox on January 23, 2018.  There was no change in her assessment of Ms. DellaValle-Jones at that time, so she once again selected Ms. DellaValle-Jones for layoff.  In three other instances, employees' scores changed, two of which decreased and one of which improved.  However, the RIF was again delayed, this time until May 2018.  Accordingly, although Ms. Malone's January 2018 assessments were ultimately used in connection with implementation of Project Compass, no personnel changes were made based on that basis until May 2018.

6

Between Ms. Malone's assessments in September 2017 and January 2018 and the eventual implementation of Project Compass in May 2018, several developments occurred that altered her initial layoff selections.  One of her selections, Ms. Palmer, resigned in December 2017 before the RIF was implemented.  Despite Ms. Palmer's resignation, however, Xerox determined that she could not be counted toward the Project Compass reductions because the elimination of her position occurred in 2017.  Another of Ms. Malone's selections, Ms. Thompson, retired in March 2018 as part of a voluntary RIF announced by Xerox early in 2018, but, like Ms. Palmer, Ms. Thompson could not be counted toward the Project Compass reductions because her position, working onsite with a client in Minneapolis, was required to be backfilled to satisfy contractual delivery requirements.  Ms. Hughes was also initially selected for layoff by Ms. Malone, but on April 18, 2018, she was offered and subsequently accepted a transfer as part of the Project Compass restructuring into a new role that reported directly into the newly configured SDM position and required being onsite in the Washington D.C. area.  Similarly, on April 19, 2018, Ms. Malone decided to remove Mr. Lenehan from the Project Compass layoff list and reclassify him from an AOM to a site lead for a client print center in California, where, despite his prior classification as an AOM, he had already been performing the site lead job functions.  Mr. Lenehan's reclassified position was necessary to meet contractual service level requirements.

To adjust for these intervening personnel changes, Ms. Malone selected AOM David Given, an employee who was not on the original layoff list, for termination in Project Compass.  According to Ms. DellaValle-Jones, Ms. Malone chose Mr. Given for

layoff based solely on his poor performance in the AOM role, as opposed to an assessment of the suitability of his skills for the reconfigured SDM position, which was the rubric Ms. DellaValle-Jones contends Ms. Malone applied when choosing her for layoff in Project Compass. Ms. Malone satisfied her remaining Project Compass headcount reduction requirement with the retirements of Glen Robichau, effective May 1, 2018, and Patti Franklin, effective June 30, 2018.

Xerox implemented Project Compass in May 2018. On May 1, 2018, Ms. Malone notified Ms. DellaValle-Jones and Mr. Given that, as part of the RIF, their employment would be terminated effective May 15, 2018. Ms. Malone did not attempt to transfer Ms. DellaValle-Jones to any other position in the restructuring as she had with Ms. Hughes and Mr. Lenehan. Nor did Ms. Malone inquire of Ms. DellaValle-Jones whether she would be willing to relocate or become an on-site rather than virtual employee in order to avoid being laid off or terminated.

The only employee from Ms. Muncy's former team who remained employed following the Project Compass RIF was Diorka Ortega, a senior employee with many years' experience with various accounts. Prior to the RIF, Ms. Ortega worked as an SDM and did not perform billing work. In total, pursuant to Project Compass, Xerox laid off nineteen individuals (including Ms. DellaValle-Jones) holding AOM positions in its North America Operations, Service Delivery Organization. None of the twenty-eight employees holding the original SDM positions were selected for termination.

#### IV.    Plaintiff's Pregnancy and Request for Short Term Disability

In mid-December 2017, Ms. DellaValle-Jones learned she was pregnant.  She informed Ms. Muncy of her pregnancy shortly thereafter, on the same day her pregnancy was confirmed via ultrasound.  DellaValle-Jones Dep. at 84.  Ms. DellaValle-Jones informed other co-worker of her pregnancy following her twelve-week medical appointment.  *Id.* at 84–85.  She did not inform Ms. Malone of her pregnancy at this time, however, because she did not feel that she had "that type of relationship" with Ms. Malone, given that they rarely had occasion to speak with one another or otherwise interact.  *Id.* at 63–64, 88.  Thus, Ms. Malone was not initially made aware of Ms. DellaValle-Jones's pregnancy.

In March 2018, at Ms. DellaValle-Jones's 20-week appointment with her physician, her baby was diagnosed with stage 2 chronic kidney disease, or multicystic kidney disease.  As a result, Ms. DellaValle-Jones was moved to high-risk maternal fetal medicine to continue the monitoring of her pregnancy.  Ms. DellaValle-Jones informed Ms. Muncy by telephone of her pregnancy complications immediately following this appointment.  Ms. Malone first learned of Ms. DellaValle-Jones's pregnancy on March 26, 2018, when Ms. Muncy informed her via email that Ms. DellaValle-Jones was having pregnancy related complications.

On April 25, 2018, Ms. DellaValle-Jones informed Ms. Muncy that it was possible she would need to take short-term disability leave because, due to additional complications related to her pregnancy, her doctor had recommended medical leave to

reduce her stress and anxiety.  According to Defendants, Ms. DellaValle-Jones did not at that time indicate any specific day on which she intended to begin her leave.

Later in the evening on April 25, 2018, Ms. Malone communicated via computer instant messaging with Tammy Leger, a program manager for Project Compass, regarding the possibility Ms. DellaValle-Jones would require a leave of absence.  The relevant portion of that conversation proceeded as follows:

> **Leger, Tammy G 7:18 PM:**
> Do we have P&G billing transition covered with Courtneay [DellaValle-Jones] being on the list to go?  I see Sally [Muncy] will be the SDM going forward.
>
> **Malone, Lynne 7:20 PM:**
> [H]ope so – Sally will have to do it if not.  Sally has been told to move Medtronic and P&G over, it's been like pulling teeth.  … [A]ctually, I feel bad.  Courtnaey is pregnant, there are issues with baby and Sally told me tonight she may be going on leave of absence. ugh ……
>
> **Leger, Tammy G 7:21 PM:**
> Oh no.  I hate to hear that.  I really liked working with her[.]  She was new at the time.
>
> **Malone, Lynne 7:21 PM:**
> I don't think she is married either ………….as I said, I feel bad.  Some of these actions have made a lifetime impact to me personally.
>
> **Leger, Tammy G 7:22 PM:**
> I know it.  It's very difficult[.]

Dkt. 57-14.

On April 30, 2018, Ms. DellaValle-Jones submitted a request for short-term disability benefits to Sedgwick, Xerox's third-party benefits administrator, which indicated that she expected to begin leave on August 10, 2018, the day her baby was due. That same day (April 30), Ms. DellaValle-Jones informed Ms. Muncy via email that she

had opened a claim due to her pregnancy complications and her doctor's concern regarding her stress and anxiety levels and "potential early leave prior to delivery."  Dkt. 57-11.  Ms. DellaValle-Jones informed Ms. Muncy that she had contacted the Xerox Integrated Absence Program ("XIAP") to assist with her leave request but did not specify in that email a date on which she intended to begin her leave.  *Id.* Ms. Muncy forwarded Ms. DellaValle-Jones's email to Ms. Malone, who confirmed with other members of Xerox management that, regardless of Ms. DellaValle-Jones's leave request, Ms. Malone was still to terminate her employment the following day as part of the Project Compass RIF.  *Id.*

### V.     Plaintiff's Short-Term Disability Leave and Termination

As discussed above, Ms. DellaValle-Jones was notified of her termination on May 1, 2018.  Prior to her termination, Ms. DellaValle-Jones had no knowledge that the RIF was going to be implemented.  When she learned she was going to be terminated, Ms. DellaValle-Jones asked Ms. Malone whether any other positions at Xerox were available and Ms. Malone told her there were no open positions.

Ms. DellaValle-Jones immediately telephoned Ms. Muncy and told Ms. Muncy of her termination.  Ms. Muncy advised Ms. DellaValle-Jones not to sign anything and to contact an attorney.  In a text exchange later that same day, Ms. Muncy informed Ms. DellaValle-Jones that, contrary to what Ms. DellaValle-Jones had been told, only two AOMs were terminated as part of the RIF, while the remaining AOMs were being transferred to different positions within the company, namely the SDM position.

11

On May 9, 2018, Ms. DellaValle-Jones revised the start date on her disability leave forms from August 10, 2018 to May 1, 2018.[3]  She requested short-term disability through September 30, 2018.  Consistent with her revised request, Ms. DellaValle-Jones's short-term disability leave, which qualified as FMLA leave, began on May 1, 2018.  The first twelve weeks of her leave were co-designated as FMLA leave, ending July 30, 2018.  At the conclusion of her short-term disability leave on September 30, 2018, Ms. DellaValle-Jones's employment was terminated due to her selection for layoff in Project Compass.

## VI.   Open SDM Position

Prior to the mandatory Project Compass RIF that occurred on May 1, 2018, Xerox offered a voluntary RIF in the first quarter of 2018.  Gabrielle Joubert, a full-time AOM who worked onsite approximately three days a week at Xerox's Cincinnati, Ohio, location, applied for the voluntary RIF.  Ms. Joubert accepted a voluntary RIF package in mid-March 2018, and her final day of employment was May 31, 2018.  Because Ms. Joubert was not counted toward the total number of employees terminated in the Project Compass RIF, Xerox planned to backfill her position with another individual.  Ms. DellaValle-Jones interacted daily with Ms. Joubert and although they were focused on different aspects of the clients' needs, they were both AOMs and had been cross-trained

---

[3] Ms. DellaValle-Jones had never previously applied for any type of leave from work.  She states that she was not familiar with short-term disability leave, so she initially chose her due date, August 10, 2018, as the first date of her disability because her leave request was related to her high-risk pregnancy.  She claims that she always intended to begin her leave as soon as it was approved and simply did not understand how to complete the form to reflect that fact.

on each other's jobs.  When Xerox replaced Ms. Joubert, however, the position that was being filled was not an AOM position, but the newly reconfigured SDM position.

According to Ms. Malone, she did not consider transferring Ms. DellaValle-Jones to fill Ms. Joubert's position because Ms. DellaValle-Jones did not apply for the position. However, because of the confidential nature of Project Compass, prior to her termination on May 1, 2018, Ms. DellaValle-Jones did not know that a non-voluntary RIF was planned by Xerox and was therefore unaware before that date of the need to apply for any other position at Xerox.  Immediately following her termination, Ms. DellaValle-Jones expressed to Ms. Muncy via text message her desire to return to Xerox and her willingness to fill any open position, but on May 1, 2018, the same day of her termination, Xerox sent an offer letter to Yolanda Smith, the wife of another Xerox employee, to fill the position opened by Ms. Joubert's departure.

A few days earlier, on April 25, 2018, before Ms. Joubert's open position was posted or anyone had applied for the job, Ms. Malone messaged Ms. Leger to discuss Ms. Della-Valle Jones's pregnancy complications and potential need to take a leave of absence.  In that same instant message conversation, Ms. Malone shared with Ms. Leger that Ms. Joubert's replacement needed to be hired and was "working to get [the] posting up," but that Xerox was "planning to hire Raymond Smith's wife."  Ms. Muncy had at that point already interviewed Ms. Smith and felt she was a good replacement for Ms. Joubert.  According to Xerox, Ms. Smith had more experience managing people than Ms. DellaValle-Jones and was also able to be on-site in Cincinnati.

## VII.   The Instant Lawsuit

Ms. DellaValle-Jones brought this action on January 23, 2020 after receiving her notice of right to sue from the Equal Employment Opportunity Commission ("EEOC") on October 31, 2019.  She alleges in this litigation that Defendants' intentionally terminated her after learning of her high-risk pregnancy and after she had applied for short-term disability and FMLA-qualifying leave and that Defendants also retaliated against her for engaging in statutorily protected activity, all in violation of Title VII, the ADA, and the FMLA.  Xerox has moved for summary judgment on all Ms. DellaValle-Jones's claims.

## Legal Analysis

### I.     Summary Judgment Standard

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant.  *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

### II.    Discussion

#### A.  ADA/ADAAA and Title VII/PDA Claims

Ms. DellaValle-Jones claims in this lawsuit that she was terminated because of her sex and disability, specifically her high-risk pregnancy, and retaliated against for seeking

short-term disability for her pregnancy complications, all in violation of the ADA, as amended by the ADAAA, and Title VII, as amended by the PDA.  An analysis of these claims invokes the Seventh Circuit's decision in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016), which states that regardless of whether the court uses the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or some other framework to evaluate a plaintiff's employment discrimination and retaliation claims, "the ultimate legal question 'is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'"  *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).  Under this "simplified" approach, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence."  *Ortiz*, 834 F.3d at 765.

Here, Ms. DellaValle-Jones has chosen not to proceed under the *McDonnell Douglas* framework, arguing instead that, in considering the totality of the evidence, a jury could readily conclude that Defendants unlawfully discriminated and retaliated against her in violation of the ADA and Title VII when it terminated her employment the day after she requested short-term disability leave for her pregnancy complications. Accordingly, we follow her lead and consider whether the evidence adduced by Ms. DellaValle-Jones, when viewed holistically, would permit a reasonable jury to conclude

that her pregnancy, pregnancy-related disability, or her engagement in protected activity was a motivating factor in her discharge.

The evidence here establishes that, although Ms. DellaValle-Jones was not informed of her inclusion in the company-wide RIF until the day *after* she requested short term disability leave for her pregnancy complications, Ms. Malone's decision to include her in the RIF occurred months prior, long *before* Ms. DellaValle-Jones became pregnant and informed Ms. Malone of her pregnancy, its high-risk nature, and her need for medical leave. Specifically, Ms. DellaValle-Jones does not dispute that Ms. Malone conducted the relevant RIF assessments of her performance on September 14, 2017, well before Ms. DellaValle-Jones was pregnant, and again on January 23, 2018, again well before Ms. Malone was aware of Ms. DellaValle-Jones's pregnancy and before the pregnancy was designated as high-risk. Ms. Malone rated Ms. DellaValle-Jones poorly in each evaluation, which assessments were based on Ms. Malone's perception of each employee's ability to perform the requirements of the reconfigured SDM role that would replace the AOM position company-wide when the RIF was implemented. After each of the two rounds of assessments, Ms. Malone selected Ms. DellaValle-Jones as one of the AOMs designated for layoff in the RIF.[4]

---

[4] Ms. DellaValle-Jones argues that she was treated differently than similarly situated employees during the evaluation process. Specifically, she claims that Ms. Malone applied a "harsher metric" to assess her performance than was later used to assess Mr. Given, the other AOM Ms. Malone selected for termination as part of the RIF. Even assuming that Ms. DellaValle-Jones and Mr. Given were assessed using different rubrics, because she was evaluated prior to Ms. Malone's knowledge of her pregnancy and leave request, Ms. DellaValle-Jones cannot establish that any difference in performance metrics was due to her membership in a protected class or her engagement in protected activity. Accordingly, we reject this argument.

16

Ms. DellaValle-Jones admits that Ms. Malone was not made aware of her pregnancy until March 26, 2018, the date on which Ms. Muncy informed Ms. Malone that Ms. DellaValle-Jones was experiencing pregnancy complications, and that Ms. DellaValle-Jones did not engage in statutorily protected activity until at least April 25, 2018, when she alerted Ms. Malone to the possibility that she might need medical leave before officially requesting short-term disability leave on April 30, 2018.[5]  This timeline establishes that Ms. Malone had no knowledge of Ms. DellaValle-Jones's pregnancy and pregnancy-related disability or engagement in statutorily protected activity until well after she had evaluated Ms. DellaValle-Jones, given her the second-worst rating of the AOMs assessed, and, based on those assessments, selected her for termination.  Without such knowledge, Ms. Malone's January 2018 decision cannot have been motivated in any part by unlawful animus.  *See, e.g.*, *Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512–13 (7th Cir. 2021) ("In order to demonstrate that a defendant was motivated to retaliate based on the plaintiff's protected activity, the plaintiff must first produce evidence that the defendant had actual knowledge of the protected activity."); *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1006 (7th Cir. 2000) ("[The plaintiff's] claim of pregnancy discrimination … cannot be based on her *being* pregnant if [the decisionmaker] did not know she was.") (emphasis in original).

---

[5] We assume without deciding for purposes of this motion that, beginning on March 26, 2018, Ms. DellaValle-Jones was disabled under the ADA and that her April 30, 2018 request for short-term disability leave constituted statutorily protected activity under the ADA and Title VII.

A potentially complicating factor in our analysis, however, arises from the fact that the effective date of the RIF was delayed for more than three months until the beginning of May 2018; thus, by the time Defendants notified Ms. DellaValle-Jones of her termination, Ms. Malone had learned of Ms. DellaValle-Jones's protected characteristics and protected activity, "thus creating a unique situation" in which Ms. Malone initially "made a non-discriminatory decision, but acquired knowledge of Plaintiff's protected activity [and characteristics] before it was implemented." *Salameh v. Sears Holding Mgmt. Corp.*, No. 08 C 4372, 2010 WL 183361, at *6 (N.D. Ill. Jan. 13, 2010) (granting summary judgment in the defendant's favor where termination decision was made before it became aware of the plaintiff's FMLA leave request but did not implement that decision until the day before plaintiff's approved FMLA leave began). Because Ms. DellaValle-Jones cannot show that Ms. Malone's initial selection of her for termination was motivated by discriminatory or retaliatory animus, her ADA and Title VII discrimination and retaliation claims can survive summary judgment only if she can establish that, once Ms. Malone learned of her high-risk pregnancy, related disability, and/or request for short-term disability leave, Ms. Malone was motivated by discriminatory or retaliatory animus in choosing to keep Ms. DellaValle-Jones on the termination list.

In an attempt to make such a showing, Ms. DellaValle-Jones points to the fact that Ms. Malone made changes to the RIF termination list in March and April, after she was aware of Ms. DellaValle-Jones's pregnancy complications, removing certain non-pregnant and non-disabled employees from the termination list and transferring them to

different positions within the company.  Ms. DellaValle-Jones argues that a reasonable jury could conclude from these transfers that the January 2018 termination decisions were not final and that Ms. Malone's failure to offer to transfer her to an open position after learning of her at-risk pregnancy and her request for short-term disability leave, despite being aware of a position opening at the end of May 2018 due to Ms. Joubert's retirement, is evidence of discriminatory and/or retaliatory animus.

It is true that "better treatment of people similarly situated but for the protected characteristic" can be evidence supporting an inference of discriminatory or retaliatory animus.  *See Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020).  "A similarly situated employee is one who is directly comparable to the plaintiff in all material respects."  *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007) (citation and quotation marks omitted).  In assessing whether employees are similarly situated, "courts consider whether the employees 1) had the same job description; 2) were subject to the same standards; 3) were subject to the same supervisor; and 4) had comparable experience, education, and other qualifications."  *Id.; see also Raymond v. Ameritech Corp.*, 442 F.3d 600, 610–11 (7th Cir. 2006) ("We have noted that in reduction-in-force [] cases such as this, 'plaintiffs were required to show at minimum that the [allegedly similarly situated] employees possessed analogous attributes, experience, education, and qualifications relevant to the positions sought ….'") (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000) (collecting cases)).

The only transferred employee Ms. DellaValle-Jones specifically identifies in her briefing as being similarly situated to her is Brendan Lenehan, an AOM whom Ms. Malone removed from the RIF termination list in April 2018 and transferred to a position as one of the newly-formed SDMs.  Defendants, however, have presented undisputed evidence that Mr. Lenehan had been misclassified as an AOM and had actually been performing the duties of a site lead.  Ms. Malone removed him from the termination list because he was already working at the client site in California and was performing contractually required duties.  Under these circumstances, Mr. Lenehan cannot be deemed similarly situated to Ms. DellaValle-Jones as he is not "directly comparable" to her "in all material respects."  Because Ms. DellaValle-Jones has provided no information as to any other alleged comparator whom she claims was removed from the termination list after January 2018, we cannot find that she was treated less favorably than any similarly situated non-disabled, non-pregnant employee on the RIF termination list, given that "the [similarly situated] inquiry is fact intensive, requiring consideration of the circumstances as a whole," (*Raymond*, 442 F.3d at 610), and we have not been provided sufficient facts to make such a determination.

Ms. DellaValle-Jones also takes issue with Ms. Malone's failure to consider her to fill the position that Ms. Joubert was vacating at the end of May 2018, instead of hiring Yolanda Smith—a non-pregnant, non-disabled woman who had never worked at Xerox—to fill the position, without posting the job opening.  Initially, we note that employers typically have no duty under the ADA or Title VII to transfer employees to other positions within the company following a RIF.  *See Jackson v. Cook Cnty.*, No. 93-

20

C 4829, 1995 WL 461758, at *4 (N.D. Ill. Aug. 1, 1995) ("Generally, [under Title VII], an employer does not have a duty to transfer employees within the company after a RIF."); *Arista v. Panek Precision*, No. 04 C 4455, 2005 WL 3262969, at *5 (N.D. Ill. Nov. 28, 2005) ("[A]n employer has no duty [under the ADA] to transfer an employee to another position when it reduces its workforce.").  Employers may not, however, fail to transfer an employee slated for termination in a RIF for discriminatory or retaliatory reasons.  To demonstrate prohibited animus, "an employee must do more than show a general interest in obtaining some job"; instead, to be probative of unlawful intent, an employee must show that she "was qualified for and applied for specific jobs that were available during the RIF."[6]  *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 919 (7th Cir. 2000) (citations and quotation marks omitted).

Although Ms. DellaValle-Jones argues that she was qualified for the position vacated by Ms. Joubert because she and Ms. Joubert performed "materially the same job description" and they had been "cross-trained on each other's jobs," (Dkt. 60 at 11), Ms. DellaValle-Jones's ability to perform Ms. Joubert's AOM duties has little relevance in determining her ability to perform the duties of the reconfigured SDM position for which Ms. Smith was hired to fill following Ms. Joubert's retirement.  As discussed above, Ms. Malone found Ms. DellaValle-Jones's abilities lacking when evaluating her performance under that specific metric, to wit, the ability to perform the duties of the reconfigured

---

[6] Because Ms. DellaValle-Jones was unaware of the impending RIF, she had no reason to believe she needed to apply for other jobs.  Additionally, the undisputed evidence establishes that Defendants did not post the job opening prior to hiring Ms. Smith.  Accordingly, Ms. DellaValle-Jones cannot be faulted for failing to apply for the position vacated by Ms. Joubert.

SDM role.  Ms. DellaValle-Jones maintains that her AOM duties and those of the reconfigured SDM position were basically the same and that Ms. Malone's evaluations of her were therefore inaccurate as she was already performing those duties well.  The relevant question, however, is not whether Ms. Malone's assessments were correct or fair; rather, the proper inquiry is whether Ms. Malone honestly believed that Ms. DellaValle-Jones was not well-qualified for the reconfigured SDM role.  *See Juniel v. Park Forest-Chicago Heights Sch. Dist. 163*, 176 F. Supp. 2d 842, 854 (N.D. Ill. 2001) (holding that the plaintiff failed to demonstrate pretext when he did not "present[] any evidence that would cause a reasonable factfinder to question whether [the defendant] honestly believed its assessment" of his performance).  Here, Ms. Malone's evaluations were conducted prior to Ms. Malone's knowledge of Ms. DellaValle-Jones's high-risk pregnancy, pregnancy-related disability, or engagement in protected activity, and Ms. DellaValle-Jones has adduced no evidence to impeach the credibility of Ms. Malone's assessments.

Even assuming that Ms. Malone was qualified to fill the reconfigured SDM position, she has adduced no evidence on which a reasonable jury could rely to find that her failure to be transferred to that open position was the result of discriminatory or retaliatory animus.  The evidence establishes that, in mid-March 2018, Ms. Joubert indicated her intention to retire at the end of May 2018.  Although this announcement would therefore have occurred prior to Ms. Malone learning of Ms. Dellavalle-Jones's high-risk pregnancy at the end of March 2018 as well as Ms. DellaValle-Jones's request for medical leave at the end of April 2018, there is no evidence that Defendants ever

considered Ms. DellaValle-Jones as a candidate to transfer to the position vacated by Ms. Joubert or otherwise backtracked from their January 2018 non-discriminatory decision to terminate Ms. DellaValle-Jones in the RIF.  The fact that she was never considered for that position, even prior to Ms. Malone learning of her protected status tends to negate the inference that it was her protected status which "tipped the balance" in favor of termination rather than transfer.[7]  *See Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000).

We are therefore left with evidence only of temporal proximity.  Ms. DellaValle-Jones was notified of her termination on May 1, 2018, a mere one day after she officially requested short-term disability leave for her pregnancy complications on April 30, 2018. While this timing at first blush appears suspicious, as discussed above, the record reflects that Ms. DellaValle-Jones had been slated for termination since January 23, 2018, more than three months prior.  Further evidence supporting the conclusion that the May 1 date was not tied to her request for short term disability leave or other protected characteristic includes the fact that other Xerox employees, including Mr. Given, the other AOM whom

---

[7] Ms. DellaValle-Jones excerpts from an April 25, 2018 instant message exchange between Ms. Malone and Ms. Leger, another Xerox employee involved with implementing the RIF, the following comment made by Ms. Malone as evidence of discriminatory and/or retaliatory intent: "Courtneay [DellaValle-Jones] is pregnant, there are issues with baby and Sally told me tonight she may be going on leave of absence.  ugh……" Dkt. 57-14.  This comment must be placed in context of the larger conversation, however.  Ms. Leger responds: "Oh no, I hate to hear that.  I really liked working with her[.]"  *Id.*  Ms. Malone then states: "I don't think she is married either………..as I said, I feel bad.  Some of these actions have made a lifetime impact to me personally."  *Id.*  Ms. Leger responds: "I know.  It's very difficult."  *Id.*  When read in context, it is clear that Ms. Malone was not disparaging Ms. DellaValle-Jones's pregnancy or leave request; indeed, she appeared sympathetic to Ms. DellaValle-Jones's circumstances.  Accordingly, Ms. Malone's comment has little value in establishing unlawful animus.

Ms. Malone had selected for termination as part of the RIF, were likewise notified on

May 1 of their terminations as part of the RIF.  In any event, it is well-established under

Seventh Circuit law, that "[o]n summary judgment, in particular, 'it is clear mere

temporal proximity is not enough to establish a genuine issue of material fact.'"

*Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008) (quoting

*Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004)).

In sum, the evidence here establishes that Ms. Malone was unaware of Ms.

DellaValle-Jones's pregnancy, its high-risk nature, or her need for short term disability

leave at the time Ms. Malone evaluated her performance and selected her for termination

in the company-wide RIF.  Because Ms. DellaValle-Jones has failed to designate

evidence giving rise to an inference that Defendants' failure to transfer her to an open

position after they learned of her pregnancy complications and need for medical leave

was motivated by any unlawful discriminatory animus or retaliatory motive, we cannot

conclude that a reasonable jury viewing the evidence holistically could find that Ms.

DellaValle-Jones's high-risk pregnancy or request for short term disability leave was a

motivating factor in Defendants' decision to terminate her employment.  Accordingly,

Defendants are entitled to summary judgment on her ADA and Title VII discrimination

and retaliation claims.

### B. FMLA Claims

Two types of claims are recognized under the FMLA: (1) claims of employer

interference with an employee's exercise or attempt to exercise any FMLA right, and (2)

claims of employer retaliation for an employee's exercise of those rights.  *See Preddie v.*

*Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 816, 819 (7th Cir. 2015); *see* 29

U.S.C. § 2615, 29 C.F.R. § 825.220.  Here, Ms. DellaValle-Jones alleges that Defendants

interfered with the exercise of her FMLA rights by failing, after she had requested short-

term disability leave, to assign her to the open position vacated by Ms. Joubert.  Ms.

DellaValle-Jones further alleges that Defendants retaliated against her by terminating her

employment after she requested short-term disability leave.  For the following reasons,

neither of these claims survives summary judgment.

### 1.  FMLA Interference

To prove a claim for FMLA interference, Ms. DellaValle-Jones must be able to

establish the following five elements: (1) she was eligible for FMLA leave; (3) Xerox

was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she

provided notice of her intent to take leave; and (5) Xerox denied or interfered with the

FMLA benefits to which she was entitled.  *Lutes v. United Trailers, Inc.*, 950 F.3d 359,

365 (7th Cir. 2020).  "Firing an employee to prevent her from exercising her right to

return to her prior position can certainly interfere with that employee's FMLA rights."

*Goelzer v. Sheboygan Cty., Wis.*, 604 F.3d 987, 993 (7th Cir. 2010) (quoting *Simpson v.

Office of the Chief Judge of the Circuit Court of Will Cnty.*, 559 F.3d 706, 712 (7th Cir.

2009)).

Ms. DellaValle-Jones argues that, because Defendants knew prior to terminating

her that there was a position opening up at the end of May 2018 for which she was

qualified, she had a right to be reinstated to that position after her FMLA and short-term

disability leave concluded.  She claims that Defendants' decision to fire her rather than

offer her that position therefore interfered with her FMLA rights.  However, "[a]n employee … has no right to reinstatement … if, at the end of h[er] twelve-week period of leave, [s]he is either unable or unwilling to perform the essential functions of h[er] job." *Franzen v. Ellis Corp.*, 543 F.3d 420, 426 (7th Cir. 2008) (citations omitted).

Here, Ms. DellaValle-Jones began her FMLA leave on May 1, 2018, which leave expired twelve weeks later, near the end of July.  Ms. DellaValle-Jones testified that she gave birth to her child on July 6, 2018, after which she was medically incapacitated for eight to ten additional weeks, through at least September 1, 2018.  Accordingly, the undisputed evidence establishes that she was not able to return to work when her FMLA twelve-week period of leave ended, meaning she had no right to reinstatement under the FMLA.  *See id.* ("[I]f [the plaintiff] was either unwilling or unable to return to work at the expiration of his FMLA leave, [the defendant] lawfully could have terminated his employment …."小).  Ms. DellaValle-Jones testified that she would have returned to work following her pregnancy, but even assuming she was willing to return to work after her FMLA leave expired, the undisputed evidence establishes that she was not yet medically able to return.  For these reasons, her FMLA interference claim based on Defendants' failure to reinstate her following her FMLA leave cannot survive summary judgment.

### 2.  FMLA Retaliation

An employer who discriminates against an employee for engaging in protected activity, such as seeking FMLA leave, is liable for FMLA retaliation.  29 U.S.C. § 2615(a).  To establish a claim for FMLA retaliation, Ms. DellaValle-Jones must prove that she (1) engaged in statutorily protected activity; (2) she was subjected to an adverse

employment action; and (3) the protected activity caused the adverse employment action. *Riley v. City of Kokomo*, 909 F.3d 182, 188 (7th Cir. 2018) (citation omitted).  These elements are the same as are required to prove a retaliation claim under both the ADA and Title VII.  Because Ms. DellaValle-Jones relies on the same evidence and argument we discussed and rejected in Part II.A. above, her FMLA retaliation claim likewise fails for those same reasons; namely, that the termination decision was made prior to her engagement in protected activity and thus could not have been motivated by such protected activity.  *See Salameh*, 2010 WL 183361, at *7 ("The FMLA is a shield to prevent an employer from acting pursuant to a prohibited animus, it is not a sword with which employees can disrupt their employer's non-actionable decisions.").  Accordingly, Defendants are entitled to summary judgment in their favor on Plaintiff's FMLA retaliation claim.

## III.     Conclusion

For the reasons detailed above, Defendants' Motion for Summary Judgment [Dkt. 48] is <u>GRANTED</u>.  Final judgment shall be entered accordingly.

IT IS SO ORDERED.

Date: _____3/31/2022_____          _Sarah Evans Barker_____
                                                SARAH EVANS BARKER, JUDGE
                                                United States District Court
                                                Southern District of Indiana

Distribution:

Nicole Seale Adler
THE KULLMAN FIRM
nsa@kullmanlaw.com

Sandra L. Blevins
BETZ & ASSOCIATES
sblevins@betzadvocates.com

Chad Harrison Holler
BETZ & BLEVINS
choller@betzadvocates.com

Jessica M. Thomas
THE KULLMAN FIRM
jmt@kullmanlaw.com